No. 24-1807

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

CHARLES BENNETT,

Plaintiff-Appellant,

v.

BAYER CORPORATION, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of New Jersey

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA AS
## AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

PHILIP R. SELLINGER
  *United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
CAROLINE W. TAN
  *Attorneys, Appellate Staff
  Civil Division, Room 7236
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 616-4171*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES .................................................................. 1

STATEMENT OF THE CASE .............................................................................. 1

    A.    The False Claims Act.......................................................................1

    B.    Food and Drug Administration Drug Approval..........................2

    C.    Prior Proceedings ..............................................................................5

SUMMARY OF ARGUMENT ........................................................................... 10

ARGUMENT ...................................................................................................... 11

A CONTRACTUAL RELATIONSHIP IS NOT NECESSARY TO
    BRING A FRAUDULENT INDUCEMENT CLAIM UNDER
    THE FALSE CLAIMS ACT...................................................................... 11

CONCLUSION ................................................................................................... 25

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                         **Page(s)**

*American Bankers Ass'n v. United States,*
932 F.3d 1375 (Fed. Cir. 2019) .......... 17

*Cook County v. United States ex rel. Chandler,*
538 U.S. 119 (2003) .......... 1, 11

*Hutchins v. Wilentz, Goldman & Spitzer,*
253 F.3d 176 (3d Cir. 2001) .......... 16

*Plavix Mktg., Sales Practice & Prods. Liab. Litig. (No. II), In re,*
332 F. Supp. 3d 927 (D.N.J. 2017) .......... 9, 23, 24

*Rainwater v. United States,*
356 U.S. 590 (1958) .......... 15, 21

*United States v. Neifert-White Co.,*
390 U.S. 228 (1968) .......... 14, 15, 21

*United States v. Veneziale,*
268 F.2d 504 (3d Cir. 1959) .......... 12

*United States ex rel. Campie v. Gilead Scis., Inc.,*
862 F.3d 890 (9th Cir. 2017) .......... 18, 19, 20, 22

*United States ex rel. Hendow v. University of Phx.,*
461 F.3d 1166 (9th Cir. 2006) .......... 12, 17, 20

*United States ex rel. Main v. Oakland City Univ.,*
426 F.3d 914 (7th Cir. 2005) .......... 16, 17, 22

*United States ex rel. Marcus v. Hess,*
317 U.S. 537 (1943) .......... 12, 13, 14, 21

*United States ex rel. Petratos v. Genentech Inc.,*
855 F.3d 481 (3d Cir. 2017) .......... 10, 18, 19

*United States ex rel. Schmidt v. Zimmer, Inc.,*
386 F.3d 235 (3d Cir. 2004) .......... 12, 15, 16

*United States ex rel. Thomas v. Siemens AG,*
  593 F. App'x 139 (3d. Cir. 2014) ....................... 9

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
  579 U.S. 176 (2016) ..................................... 22

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
  529 U.S. 765–70 (2000) ................................. 2

**Statutes:**

False Claims Act (FCA):
  31 U.S.C. § 3729 *et seq.* .................................... 1
    31 U.S.C. § 3729(a) ..................................... 2
    31 U.S.C. § 3729(a)(1)(A) .............................. 2, 11
    31 U.S.C. § 3729(a)(1)(B) ................................ 2
    31 U.S.C. § 3729(b)(1) ................................... 2
    31 U.S.C. § 3730(b)(2) ................................... 2
    31 U.S.C. § 3730(c)(3) ................................... 2
    31 U.S.C. § 3730(d) ..................................... 2

Federal Food, Drug, and Cosmetic Act:
  21 U.S.C. § 331(e) ....................................... 4
  21 U.S.C. § 355 .......................................... 3
  21 U.S.C. § 355(b)(1)(A)(i) ............................... 3
  21 U.S.C. § 355(b)(1)(A)(ii) .............................. 3
  21 U.S.C. § 355(e) ....................................... 3
  21 U.S.C. § 355(k)(1)-(3) ................................. 4
  21 U.S.C. § 355(o)(4)(A) ................................. 3
  21 U.S.C. § 355(o)(4)(B) ................................. 4
  21 U.S.C. § 355(o)(4)(E) ................................. 3

42 U.S.C. § 1395w-102(e)(1) ................................ 5

42 U.S.C. § 1396r-8(k)(2)(A) ............................... 5

**Regulations:**

21 C.F.R. § 314.80(c) ............................................... 4

21 C.F.R. § 314.80(k) ............................................... 4

**Legislative Material:**

S. Rep. No. 99-345 (1986) ...................................... 1

**Other Authorities:**

CMS, Pub. 100-2, *Medicare Benefit Policy Manual*, ch. 15
(Mar. 7, 2024), https://perma.cc/9B5U-TWN4 ...........................................5

86 Fed. Reg. 1516 (Jan. 8, 2021) ........................................... 6

86 Fed. Reg. 58674 (Oct. 22, 2021) ...................................... 6

## INTEREST OF THE UNITED STATES

The False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, is the federal government's primary tool to combat fraud and recover losses due to fraud in federal programs. Accordingly, the United States has a substantial interest in the proper interpretation of the FCA. The United States submits this amicus brief to address the district court's erroneous holding that fraudulent inducement claims under the FCA require a contractual relationship. The government takes no position on the district court's alternative holding regarding the sufficiency of plaintiff's complaint.

## STATEMENT OF THE CASE

### A.    The False Claims Act

The False Claims Act is "the Government's primary litigative tool" for combatting fraud, and it was intended "to reach all fraudulent attempts to cause the Government to pay out sums of money." S. Rep. No. 99-345, at 2, 9 (1986). Congress therefore drafted the statute "expansively[] . . . 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003).

An FCA violation occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). A violation also occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

The FCA authorizes suits to collect statutory damages and penalties either by the Attorney General or by a private person (known as a *qui tam* relator) in the name of the United States. 31 U.S.C. § 3730(a), (b)(1); *see also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769–70 (2000). If a relator files a *qui tam* action, the government may intervene and take over the case. 31 U.S.C. § 3730(b)(2). If the government declines to intervene, the relator conducts the litigation. *Id.* § 3730(c)(3). Monetary awards from a *qui tam* suit are divided between the government and the relator. *Id.* § 3730(d).

### B.    Food and Drug Administration Drug Approval

1. Under the Federal Food, Drug, and Cosmetic Act, the Food and Drug Administration (FDA) must approve a drug before a manufacturer can market the drug in the United States. FDA will approve a new drug

application (NDA) only after determining, among other things, that the new drug is safe and effective for its intended use. *See generally* 21 U.S.C. § 355. A manufacturer seeking approval must provide FDA with significant information, including "full reports of investigations which have been made to show" whether the drug is safe and effective for use, *id.* § 355(b)(1)(A)(i), and "a full list of the articles used as components of such drug," *id.* § 355(b)(1)(A)(ii).

Even after approval, FDA has authority to revoke the NDA under certain circumstances. For example, FDA may revoke approval when data shows "that [the] drug is unsafe for use" for the approved use or when new information demonstrates there is no longer sufficient evidence to establish the drug's safety or efficacy for the approved use. 21 U.S.C. § 355(e). FDA may also revoke its approval when it learns that the approved application contained "any untrue statement of a material fact." *Id.* FDA can also require safety labeling changes if it becomes aware of "new safety information" or "information related to reduced effectiveness" of the drug. *Id.* § 355(o)(4)(A), (E). Safety labeling changes can include changes to a label's boxed warnings or the addition of contraindications,

warnings, precautions, adverse reactions, and new effectiveness information. *Id.* § 355(o)(4)(B).

To enable FDA to make these and other determinations, pharmaceutical companies with approved NDAs are required to submit reports of adverse events associated with those drugs to FDA. *See* 21 C.F.R. § 314.80(c); *see also* 21 U.S.C. § 331(e); *id.* § 355(k)(1)–(3) (authorizing regulations governing the collection and reporting of data). Failure to meet this requirement can result in the withdrawal of FDA approval. 21 C.F.R. § 314.80(k).

2. FDA approval is relevant to a number of government healthcare programs. For example, some government agencies directly purchase pharmaceutical products for their own distribution—such as when the Department of Veterans Affairs purchases drugs for use by veterans being treated in the Veterans Affairs healthcare system, or when the Bureau of Prisons purchases drugs that will be administered to federal inmates. In a number of circumstances, FDA approval is a prerequisite for a federal agency to be able to buy the drugs.

There are also several government programs that operate under a reimbursement model, including Medicare (administered by the Centers

for Medicare and Medicaid Services (CMS) within the Department of Health and Human Services) and Medicaid (administered jointly by CMS and the states). In a reimbursement program, a healthcare provider such as a pharmacy or hospital will dispense a covered drug to a program beneficiary. Then, the healthcare provider will send a request for reimbursement to a paying entity (such as a state Medicaid agency or a Medicare Part B contractor). For Medicaid and Medicare Part D's prescription drug benefit for self-administered drugs, statutory provisions generally make FDA approval a precondition for coverage and payment (with certain narrow exceptions). *See* 42 U.S.C. § 1396r-8(k)(2)(A) (Medicaid Drug Rebate Program, defining "covered outpatient drug"); *id.* § 1395w-102(e)(1) (defining covered drugs under Medicare Part D). Interpretive guidance on Medicare Part B also clarifies that, in most circumstances, FDA approval is a condition for drug reimbursement under that program. *See* CMS, Pub. 100-2, *Medicare Benefit Policy Manual*, ch. 15, § 50.4 (Mar. 7, 2024), https://perma.cc/9B5U-TWN4.

### C. Prior Proceedings

1. Relator Charles Bennett brought this *qui tam* action against defendants Bayer Corporation and Johnson & Johnson Corporation, both

manufacturers of prescription drugs.[1]  Bayer owns Ciprofloxacin (Cipro), a widely prescribed antibiotic approved by FDA to treat a wide variety of bacterial infections.  A256, 266 (Second Amended Complaint ¶¶ 4, 46). Johnson & Johnson owns Levofloxacin (Levaquin), another antibiotic that was approved by FDA to treat a range of relatively benign bacterial infections.  A256, 267 (Second Amended Complaint ¶¶ 5, 48).  Both drugs are part of the fluoroquinolone class of antibiotics.  Levaquin was later discontinued from sale, but not for safety or effectiveness reasons.  *See* 86 Fed. Reg. 1516, 1516–17 (Jan. 8, 2021), 86 Fed. Reg. 58674, 58674–75 (Oct. 22, 2021).

The complaint alleges that defendants knew both drugs caused serious side effects, including neurological and psychiatric damage as well as an increased risk of tendon ruptures, but misrepresented information about these side effects to FDA in order to enter the market and then maintain its market position.  A256–57 (Second Amended Complaint ¶¶ 7–

---

[1] Relator also brought this action against Merck & Co., Inc., but later moved to dismiss Merck from this appeal, which this Court granted.  Dkt. Nos. 26, 28.  Johnson & Johnson Pharmaceutical Research & Development and Ortho-McNeil-Janssen Pharmaceuticals were also originally named as defendants, but later voluntarily dismissed.  A38.

9).  These side effects were allegedly so serious that Cipro and Levaquin should only have been prescribed, if at all, as a last resort.  A292–93 (Second Amended Complaint ¶ 105).  But because of defendants' conduct, the drugs were allegedly approved to "treat a broad range of relatively benign and common bacterial infections."  A293 (Second Amended Complaint ¶ 106).

According to the complaint, defendants minimized the frequency and severity of the side effects in order to mislead FDA as to the drugs' safety.  A257–59 (Second Amended Complaint ¶¶ 8–16).  Most seriously, defendants allegedly disaggregated their reports of individual psychiatric and neurological side effects, allowing them to report relatively low rates of these side effects instead of grouping them together as manifestations of a condition that relator refers to as "fl[uo]roquinolone-associated disability" or "FQAD."  A256, 271–74 (Second Amended Complaint ¶¶ 3, 57–63).  Relator asserts that defendants should have aggregated those symptoms, and that if they had done so, "a true picture of FQAD occurring at a 5% rate or higher is likely."  A274 (Second Amended Complaint ¶ 63).  These misrepresentations thus allegedly induced FDA to approve both drugs for treatment of a wide range of common bacterial infections—

regulatory actions that allegedly would not have happened had "FDA known the true extent of [fluoroquinolone] side effects."  A257 (Second Amended Complaint ¶ 10).  The complaint acknowledges that FDA required warning labels for joints- and tendon-related side effects in 2016 and for mental health side effects in 2018, but not for "FQAD symptoms."  A288–89 (Second Amended Complaint ¶¶ 92–95).

The complaint further alleges that defendants' fraud inflated the market for Cipro and Levaquin, causing the "submission of millions of claims a year to federal" healthcare programs that would "have never been reimbursed by the government" had defendants been truthful.  A295–96 (Second Amended Complaint ¶ 112).  Relator therefore alleges that defendants violated the False Claims Act by causing false or fraudulent claims to be presented for payment; by making, or causing to be made, false records or statements that were material to a false or fraudulent claim; and by conspiring to get false or fraudulent claims paid.  A296 (Second Amended Complaint ¶ 113).

2.  The district court dismissed relator's amended complaint.  A3–22. The court first recognized that a defendant can be liable under the FCA for each "claim submitted to the government under a contract which was

procured by [defendant's] fraud." A16 (quoting *United States ex rel. Thomas v. Siemens AG*, 593 F. App'x 139, 143 (3d. Cir. 2014)). While a claim for payment under these circumstances may not be "literally false," it may "become an actionable false claim if the paid claim arises from an 'original fraudulent misrepresentation.'" A16 (quotation marks omitted).

The district court nevertheless dismissed relator's complaint for two independent reasons. First, following a different district court opinion, the court held that fraudulent inducement claims under the FCA are cognizable only "in the context of *contracts* that have been *induced* by fraud." A19 (citing *In re Plavix Mktg., Sales Practice & Prods. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 952 (D.N.J. 2017)). Under this approach, defendants are liable only if the false statements led to a contract under which the claims for payment were submitted. A "non-contractual interaction with the FDA"—such as regulatory approval to enter or stay in the market—is insufficient. A20. Citing *Plavix*, the district court reasoned that because the Third Circuit has only recognized fraudulent inducement claims in the context of a contractual relationship, it would not "exceed th[ose] boundaries" by recognizing this theory of liability based on a

regulatory interaction—here, alleged fraud on FDA. A19–20. The district court thus held that relator failed to plead falsity. A20.

Second, and in the alternative, the district court held that even if it were to recognize a fraudulent inducement claim in the context of a non-contractual interaction with FDA, relator still did not sufficiently plead falsity. According to the court, relator identified no information that defendants were obligated but failed to disclose. A21. Instead, the complaint only appeared to challenge the way in which defendants presented their data, without challenging the contents of that data (*i.e.*, without arguing that defendants omitted any required information or violated FDA's approval process). A21. The district court further stated that FDA already appeared to have known about the adverse side effects, A21, and dismissed the complaint, A22.[2]

## SUMMARY OF ARGUMENT

The district court erred when it held that a fraudulent inducement claim under the False Claims Act is limited to circumstances in which the

---

[2] The district court declined to address whether relator sufficiently pled "causation, knowledge, and materiality"—the other elements of an FCA claim. A21 n.4.

fraud induces a contract. As this Court recognized in *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017), fraud directed at FDA to secure regulatory approval and establish eligibility for reimbursement under government healthcare programs may create False Claims Act liability even without a contractual relationship. The district court's holding all but eliminates the circumstances under which fraud on FDA can lead to False Claims Act liability, a result that is foreclosed by *Petratos* and is inconsistent with decades of Supreme Court precedent on fraudulent inducement claims.

## ARGUMENT

### A CONTRACTUAL RELATIONSHIP IS NOT NECESSARY TO BRING A FRAUDULENT INDUCEMENT CLAIM UNDER THE FALSE CLAIMS ACT.

1. A False Claims Act violation occurs when a person knowingly "causes to be presented[] a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). As the Supreme Court has recognized, Congress drafted this statute "expansively[] . . . 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). This Court has likewise concluded that FCA liability

attaches if a defendant "knowingly assisted in causing the government to pay claims which were grounded in fraud." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004).

Under this well-established theory—sometimes referred to as "fraud in the inducement" or "promissory fraud"—a claim can be "false or fraudulent" if it is submitted under a "contract or extension of government benefit [that] was originally obtained through false statements or fraudulent conduct." *United States ex rel. Hendow v. University of Phx.*, 461 F.3d 1166, 1173 (9th Cir. 2006); *see United States v. Veneziale*, 268 F.2d 504, 506 (3d Cir. 1959) (FCA liability may attach where the government has "been compelled to pay an innocent third person as a result of the defendant's fraud in inducing the undertaking"). In that situation, the "subsequent claims are false because of an *original fraud*," even if the specific claim for payment is not facially false. *Hendow*, 461 F.3d at 1173.

This theory is based on the foreseeable and intended result of the defendant's conduct, not the particular vehicle through which the defendant seeks government payment. In *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court explained that the crux of FCA liability is the foreseeable result of the fraud. In that case, electrical

contractors were charged with defrauding the United States by collusively bidding on projects submitted to local governments, leading to inflated prices. *Id.* at 539. Though the collusion was targeted at local municipalities, federal approval was a prerequisite to payment and the United States was ultimately responsible for a substantial portion of the funding. *Id.* at 539, 542–43. The lower court held that there could be no FCA claim because there was no "direct contractual relationship between the [contractors] and the United States," as the fraud in that case had been targeted at local government units. *Id.* at 540–41.

In reversing, the Supreme Court expressly rejected this aspect of the lower court's reasoning. The Court held that the FCA "reach[es] any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, *without regard* to whether that person had direct contractual relations with the government." *Hess*, 317 U.S. at 544–45 (emphasis added). The fact that local municipalities happened to be the vehicle through which the fraud was funneled was thus immaterial, as the FCA does not condition liability on the "bookkeeping devices" used for the distribution of federal funds. *Id.* at 544. The Court reasoned that Congress passed the FCA to "provide protection against those who would 'cheat the

13

United States.'"  *Id.*  As a result, what mattered was whether the United States would have made the challenged payments had it known about the collusion.  *Id.* at 543.  Because the answer was no, the "taint" of the original fraud infected "every swollen estimate" of the federal government's payments and FCA liability could attach.  *Id.* at 543–44.

The Supreme Court rejected a similarly "rigid, restrictive reading" of the FCA in *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  In that case, the Court held that the FCA covered false statements made to a federal agency for a loan, where the "purpose was fraudulently to induce" the agency to offer larger-than-warranted loans to the defendant's customers.  *Id.* at 230.  The Court rejected the argument that the FCA covers only a direct claim for payment (*i.e.*, an invoice) and not a "favorable action by the Government," *id.*, reasoning that the false statements in that case were "made with the purpose and effect of inducing the Government immediately to part with money," *id.* at 232.  As the Court explained, the "objective of Congress in enacting the False Claims Act 'was broadly to protect the funds and property of the Government from fraudulent claims, *regardless of* the particular form, or function, of the government instrumentality upon which such claims were made.'"  *Id.* at 233 (emphasis

14

added) (quoting *Rainwater v. United States*, 356 U.S. 590, 592 (1958)). Accordingly, it was immaterial that the defendant sought payment through a government loan program instead of an invoice. The FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Id.*

This Court has taken the same approach, focusing on the foreseeable causal chain that results from the defendant's actions and not the vehicle through which the fraud was funneled. For example, in *Schmidt,* 386 F.3d 235, the defendant corporation offered illegal kickbacks and referral incentives to medical centers for the sale of its orthopedic implants. *Id.* at 237–40. When the medical centers sought reimbursement under Medicare, they falsely certified that they complied with the applicable laws and regulations, even though their participation in defendant's program violated federal anti-kickback and anti-self-referral statutes. *Id.* at 238. The district court dismissed the complaint because defendant had not submitted the payment claims itself or "caused" the medical center to do so, *id.* at 240, but this Court reversed, reasoning that the whole purpose of defendant's scheme—"selling as many of it[s] implants as possible"— depended on the medical center's access to Medicare and the foreseeable

reality that the center would submit false certifications in order to maintain that access. *Id.* at 244. Because defendant's fraud foreseeably resulted in claims for government payment, FCA liability attached. *Id.*; *see Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 185 (3d Cir. 2001) ("[A] plaintiff may assert a cause of action under the False Claims Act even when an intermediary, such as a subcontractor, is merely a conduit to the transfer of government funds.").

Indeed, several courts of appeals have recognized fraudulent inducement claims in contexts outside of a contractual relationship. In these cases, the defendant makes false or fraudulent statements to secure access to a government benefit under which claims for federal payment are subsequently made. For example, the Seventh Circuit recognized a fraudulent inducement claim based on false statements that a university made to secure eligibility for federal funding; once eligibility was established, the defendant worked with students to apply for (and receive) federal grants, loans, and scholarships that would not have been disbursed had the university been truthful. *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005). As the Seventh Circuit correctly observed, the FCA "requires a *causal* rather than a temporal connection

16

between fraud and payment." *Id.* (emphasis added). The Ninth Circuit has similarly recognized a fraudulent inducement claim where the defendant university made false promises to secure eligibility for federal funding — after which the defendant requested federal payment directly from Pell Grant funds or indirectly through government-insured loans. *Hendow*, 461 F.3d at 1177. Neither case involved a fraudulently induced contract, *see American Bankers Ass'n v. United States*, 932 F.3d 1375, 1381–84 (Fed. Cir. 2019) (actions taken to satisfy regulatory scheme are not contracts), yet both courts acknowledged the viability of a fraudulent inducement claim.

2. Consistent with this precedent, the False Claims Act permits liability based on materially false or fraudulent statements that induce FDA to approve a particular drug (or allow the drug to remain on the market), thereby making the drug eligible for reimbursement under government healthcare programs. As explained above, FDA approval is typically a prerequisite for government healthcare programs to pay for a drug. Accordingly, in circumstances where a manufacturer makes false statements to FDA about its drug and those false statements actually cause

FDA to approve the NDA for the drug or to decline to revoke that approval, then FCA liability could potentially attach.[3]

This Court has previously recognized the viability of fraudulent inducement claims that are predicated upon fraudulent representations made to FDA, notwithstanding the lack of a contractual relationship, in circumstances materially similar to the ones presented here. In *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017), the relator alleged that the defendant had suppressed information about adverse side effects of a widely prescribed cancer drug, Avastin, which enabled the company to avoid filing adverse-event reports with FDA or making changes to the FDA-approved label for Avastin. *Id.* at 485. The relator further alleged that these omissions led doctors to prescribe Avastin more broadly than they otherwise would have, inflating the market for the drug and causing the federal government to pay significant sums in Medicare reimbursements. *Id.* at 485–86. Although this Court ultimately rejected the

---

[3] It is irrelevant for this purpose that a false statement is made to FDA rather than CMS, the division within the Department of Health and Human Services that makes payment decisions. *See United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 903 (9th Cir. 2017) ("It is not the distinction between the agencies that matters, but rather the connection between the regulatory omissions and the claim for payment.").

relator's claims, it did so on materiality grounds, as the relator had conceded that the government would have paid the claims even "with full knowledge of the alleged noncompliance." *Id.* at 490.

As a prerequisite to deciding the case on materiality grounds, the *Petratos* court accepted the basic premise that fraud on FDA could state a claim under the False Claims Act, even absent any allegation that the fraud induced a contract under which the government had to pay. The *Petratos* court recognized that the relator's claims "implicate[d] three interlocking federal schemes: the False Claims Act, Medicare reimbursement, and FDA approval." 855 F.3d at 486. The court then noted that fraud on FDA to obtain regulatory approval could establish a False Claims Act violation if the underlying treatment was not, for example, "reasonable and necessary," a Medicare requirement for which FDA approval is often a prerequisite. *Id.* (quotation marks omitted). At no point did the *Petratos* court suggest that the presence or absence of a contract was dispositive.

The Ninth Circuit, too, has acknowledged the viability of fraudulent inducement claims predicated upon fraud on FDA. In *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890 (9th Cir. 2017), the relator alleged that defendant pharmaceutical company submitted false statements

19

to FDA regarding certain HIV drugs, resulting in FDA approval of supplemental NDAs and billions of dollars in government payments for the drugs (both directly through federal programs run by the Department of Veterans Affairs, Federal Bureau of Prisons, and the Public Health Service, among others, and indirectly through reimbursement programs such as Medicare). *Id.* at 896–97. The Ninth Circuit recognized that such a claim could fall within the "fraud-in-the-inducement" theory of liability. *Id.* at 902 (quoting *Hendow*, 461 F.3d at 1173). And it held that the relators sufficiently alleged falsity under this theory because defendants "committed either factually false or impliedly false certification through its representations to the FDA and labeling of its products," making those subsequent claims for payment pursuant to FDA approval fraudulent under the False Claims Act. *Id.* at 904.

Ignoring both *Campie* and the import of this Court's decision in *Petratos*, the district court erroneously imposed a novel limitation on fraudulent inducement claims: a requirement that defendants' fraud induce a *contract*. Such a requirement would, as a practical matter, eliminate any theories of liability predicated on fraudulent statements made to FDA to secure and maintain marketing approval for drugs or

medical devices.  That result is incompatible with this Court's reasoning in *Petratos* and the Ninth Circuit's holding in *Campie*.  And the district court's holding is inconsistent with a long line of cases permitting fraudulent inducement claims where there is a foreseeable causal chain between the original fraud and the ultimate payment, regardless of whether the defendant has "direct contractual relations with the government," *Hess*, 317 U.S. at 544–45, or induces any contract at all.  *See also Neifert-White*, 390 U.S. at 233 (FCA covers "fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made" (quoting *Rainwater*, 356 U.S. at 592)).  Ultimately, in the (rare) circumstances where a defendant's false statements concealed problems that were so serious that FDA would have (for example) withheld or withdrawn its approval of the NDA for a drug had it known the truth, subsequent claims for reimbursement for that drug can be rendered "false or fraudulent" because the government would not have paid for the drugs absent the defendant's fraud.

This makes good sense.  The False Claims Act imposes liability on those who "present or directly induce the submission of false or fraudulent claims," which includes "reimbursement requests made to the recipients of

federal funds under federal benefits programs."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016).  It does not matter whether such claims are presented pursuant to a contract.  A defendant can "directly induce" the submission of false claims in a variety of ways, including contracts, loan guarantees, or, as here, regulatory approval that secures eligibility to bill the government for a drug under Medicare and other healthcare programs.  The way in which a claim is ultimately presented to the government is irrelevant so long as there is a sufficient causal nexus between the defendant's fraud and the request for payment.  *See Main*, 426 F.3d at 916 ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); *Campie*, 862 F.3d at 905 ("FDA approval is . . . 'the *sine qua non*' of federal funding . . . ."); *cf. Escobar*, 579 U.S. at 181 ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.").

In this case, the district court failed to offer any principled basis for limiting the fraudulent inducement theory to claims paid pursuant to

contracts. The court's sole basis for this holding was that the "Third Circuit has only applied the fraudulent inducement theory of liability under the FCA in the context of *contracts* that have been *induced* by fraud." A19. The district court did not address this Court's recognition in *Petratos* that fraud on FDA could, in appropriate circumstances, provide a basis for a claim under the False Claims Act. Instead, the district court relied on a different district court opinion, *In re Plavix Mktg., Sales Practice & Prods. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 953 (D.N.J. 2017), which limited the fraudulent inducement theory to claims for payments under contracts induced by fraud based, in part, on an erroneous view that this Court had not recognized the theory in the context of non-contractual regulatory interactions, *id.* at 952.

But neither the district court in this case nor the district court in *Plavix* offered any valid reason for imposing this novel limitation on the fraudulent inducement theory. The mere fact that many fraudulent inducement cases happen to involve contracts induced through fraud does not mean that this is a prerequisite for application of that theory. As explained above, the rationale for fraudulent inducement claims applies equally to requests for payments submitted under contracts and to those

submitted pursuant to other payment mechanisms that are a foreseeable and intended result of the defendant's fraud.  And in any event, *Plavix* involved a different theory of liability from the one here.  In *Plavix*, the allegation involved fraudulent marketing statements made to state formulary committees, and the *Plavix* court's unwillingness to entertain a fraudulent inducement theory there ultimately stemmed from an unwillingness to "craft a fraud-on-the-formulary theory . . . out of whole cloth."  332 F. Supp. 3d at 952.

The United States takes no position on whether relator's complaint states a claim under the fraudulent inducement theory of liability.  But even if this Court affirms the judgment below on alternative grounds, it should expressly reject the district court's erroneous holding that fraudulent inducement claims are viable only if the fraud induces a contract under which the claims for payment are submitted.  The district court's ruling on this point would not only preclude all fraud on FDA claims, contrary to *Petratos*, but would also improperly limit that theory in a variety of other contexts where defendants fraudulently obtain access to programs under which the government pays claims or awards benefits.  As both the Supreme Court and this Court have recognized, the vehicle

through which the fraud is channeled is immaterial; what matters is the

foreseeable causal relationship between the original fraud and the ultimate

payment.

## CONCLUSION

For the foregoing reasons, this Court should hold that fraudulent

inducement claims under the False Claims Act do not require a contractual

relationship.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
    *Attorney General*

PHILIP R. SELLINGER
   *United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH

 *s/ Caroline W. Tan*
CAROLINE W. TAN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7236*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-4171*
   *Caroline.Tan@usdoj.gov*

July 2024

## COMBINED CERTIFICATIONS

1. Government counsel are not required to be members of the bar of this Court.

2. This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(4)–(5) and 32(a)(7)(B) because it contains 4,912 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

3. On July 2, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

4. The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5. This document was scanned for viruses using CrowdStrike Falcon Sensor, Version 7.15.18511.0, and no virus was detected.

*s/ Caroline W. Tan*
CAROLINE W. TAN

# ADDENDUM

# TABLE OF CONTENTS

21 U.S.C. § 331(e) ........................................................................ A1

21 U.S.C. § 355 ............................................................................ A1

31 U.S.C. § 3729 .......................................................................... A5

31 U.S.C. § 3730 .......................................................................... A6

42 U.S.C. § 1395w-102(e)(1) ...................................................... A9

42 U.S.C. § 1396r-8(k)(2)(A) ...................................................... A10

21 C.F.R. § 314.80 ....................................................................... A11

**21 U.S.C. § 331(e)**

**§ 331. Prohibited acts**

The following acts and the causing thereof are prohibited:

. . .

(e) The refusal to permit access to or copying of any record as required by section 350a, 350c, 350f(j), 350e, 354, 360bbb–3, 373, 374(a), 379aa, or 379aa–1 of this title; or the failure to establish or maintain any record, or make any report, required under section 350a, 350c(b), 350f, 350e, 354, 355(i) or (k), 360b(a)(4)(C), 360b(j), (l) or (m), 360ccc–1(i), 360e(f), 360i, 360bbb–3, 379aa, 379aa–1, 387i, or 387t of this title or the refusal to permit access to or verification or copying of any such required record; or the violation of any recordkeeping requirement under section 2223 of this title (except when such violation is committed by a farm).

**21 U.S.C. § 355**

**§ 355. New drugs**

**(a) Necessity of effective approval of application**

No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.

**(b) Filing application; contents**

(1) (A) Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a).  Such persons shall submit to the Secretary as part of the application –

(i) full reports of investigations which have been made to show whether such drug is safe for use and whether such drug is effective in use;

(ii) a full list of the articles used as components of such drug;

. . .

**(e) Withdrawal of approval; grounds; immediate suspension upon finding imminent hazard to public health**

The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application with respect to any drug under this section if the Secretary finds (1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved; (2) that new evidence of clinical experience, not contained in such application or not available to the Secretary until after such application was approved, or tests by new methods, or tests by methods not deemed reasonably applicable when such application was approved, evaluated together with the evidence available to the Secretary when the application was approved, shows that such drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved; or (3) on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof; or (4) the patent information prescribed by subsection (c) was not filed within thirty days after the receipt of written notice from the Secretary specifying the failure to file such information; or (5) that the application contains any untrue statement of a material fact . . . .

. . .

**(k) Records and reports; required information; regulations and orders; access to records**

(1) In the case of any drug for which an approval of an application filed under subsection (b) or (j) is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, of data relating to clinical experience and other data or information, received or otherwise obtained by such applicant with respect to such drug, as the Secretary may by general regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to

determine, or facilitate a determination, whether there is or may be ground for invoking subsection (e). Regulations and orders issued under this subsection and under subsection (i) shall have due regard for the professional ethics of the medical profession and the interests of patients and shall provide, where the Secretary deems it to be appropriate, for the examination, upon request, by the persons to whom such regulations or orders are applicable, of similar information received or otherwise obtained by the Secretary.

(2) Every person required under this section to maintain records, and every person in charge or custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

(3) Active postmarket risk identification. –

(A) Definition.—

In this paragraph, the term "data" refers to information with respect to a drug approved under this section or under section 262 of title 42, including claims data, patient survey data, standardized analytic files that allow for the pooling and analysis of data from disparate data environments, and any other data deemed appropriate by the Secretary.

(B) Development of postmarket risk identification and analysis methods.—

The Secretary shall, not later than 2 years after September 27, 2007, in collaboration with public, academic, and private entities—

(i) develop methods to obtain access to disparate data source including the data sources specified in subparagraph (C);

(ii) develop validated methods for the establishment of a postmarket risk identification and analysis to link and analyze safety data from multiple sources, with the goals of including, in aggregate—

. . .

**(o) Postmarket studies and clinical trials; labeling**

. . .

**(4) Safety labeling changes requested by Secretary.**

**(A) New safety or new effectiveness information.**

If the Secretary becomes aware of new information, including any new safety information or information related to reduced effectiveness, that the Secretary determines should be included in the labeling of the drug, the Secretary shall promptly notify the responsible person or, if the same drug approved under subsection (b) is not currently marketed, the holder of an approved application under subsection (j).

**(B) Response to notification.**

Following notification pursuant to subparagraph (A), the responsible person or the holder of the approved application under subsection (j) shall within 30 days—

(i) submit a supplement proposing changes to the approved labeling to reflect the new safety information, including changes to boxed warnings, contraindications, warnings, precautions, or adverse reactions, or new effectiveness information; or

(ii) notify the Secretary that the responsible person or the holder of the approved application under subsection (j) does not believe a labeling change is warranted and submit a statement detailing the reasons why such a change is not warranted.

. . .

**(E) Order**

Within 15 days of the conclusion of the discussions under subparagraph (D), the Secretary may issue an order directing the responsible person or the holder of the approved application under subsection (j) to make such a labeling change as the Secretary deems appropriate to address the new safety or new effectiveness information. Within 15 days of such an order, the responsible person or the holder of the approved application under subsection (j) shall submit a supplement containing the labeling change. . . .

**31 U.S.C. § 3729**

**§ 3729. False claims**

   **(a) Liability for Certain Acts. –**

      **(1) In general. –** Subject to paragraph (2), any person who –

         (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

         (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

         (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)

   . . .

         (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

      is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410[1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

---

[1]      So in original.  Probably should be "101-410".

**31 U.S.C. § 3730**

**§ 3730. Civil actions for false claims**

**(a) Responsibilities of the Attorney General. –**

The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

**(b) Actions by Private Persons. –**

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) [1] of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

. . .

**(c) Rights of the Parties to Qui Tam Actions. –**

(1) If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

. . .

(3) If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings

filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

. . .

**(d) Award to Qui Tam Plaintiff. –**

(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [2] Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily

incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(3) Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

(4) If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

. . .

**42 U.S.C. § 1395w-102**

**§ 1395w-102. Prescription drug benefits**

. . .

**(e) Covered part D drug defined**

(1) In general

Except as provided in this subsection, for purposes of this part, the term "covered part D drug" means—

(A) a drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1396r–8(k)(2) of this title;

(B) a biological product described in clauses (i) through (iii) of subparagraph (B) of such section or insulin described in subparagraph (C) of such section and medical supplies associated with the injection of insulin (as defined in regulations of the Secretary); or

(C) for the period beginning on December 29, 2022, and ending on December 31, 2024, an oral antiviral drug that may be dispensed only upon a prescription and is authorized under section 360bbb–3 of title 21, on the basis of the declaration published in the Federal Register by the Secretary of Health and Human Services on April 1, 2020 (85 Fed. Reg. 18250 et seq.),

and such term includes a vaccine licensed under section 262 of this title (and, for vaccines administered on or after January 1, 2008, its administration) and any use of a covered part D drug for a medically accepted indication (as defined in paragraph (4)).

. . .

**42 U.S.C. § 1396r-8**

**§ 1396r-8. Payment for covered outpatient drugs**

**(k) Definitions**

In this section –

(2) Covered outpatient drug

Subject to the exceptions in paragraph (3), the term "covered outpatient drug" means –

(A) of those drugs which are treated as prescribed drugs for purposes of section 1396d(a)(12) of this title, a drug which may be dispensed only upon prescription (except as provided in paragraph (4)), and—

(i) which is approved for safety and effectiveness as a prescription drug under section 505 [21 U.S.C. 355] or 507 4 of the Federal Food, Drug, and Cosmetic Act or which is approved under section 505(j) of such Act [21 U.S.C. 355(j)];

(ii)

(I) which was commercially used or sold in the United States before October 10, 1962, or which is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug, and (II) which has not been the subject of a final determination by the Secretary that it is a "new drug" (within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 321(p)]) or an action brought by the Secretary under section 301, 302(a), or 304(a) of such Act [21 U.S.C. 331, 332(a), 334(a)] to enforce section 502(f) or 505(a) of such Act [21 U.S.C. 352(f), 355(a)]; or

(iii)

(I) which is described in section 107(c)(3) of the Drug Amendments of 1962 and for which the Secretary has determined there is a compelling justification for its medical need, or is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug, and (II) for which the Secretary has not issued a notice of an opportunity for a hearing under section 505(e) of

the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 355(e)] on a proposed order of the Secretary to withdraw approval of an application for such drug under such section because the Secretary has determined that the drug is less than effective for some or all conditions of use prescribed, recommended, or suggested in its labeling; and

. . .

**21 C.F.R. § 314.80**

**§ 314.80.  Postmarketing reporting of adverse drug experiences.**

. . .

**(c) Reporting requirements**.  The applicant must submit to FDA adverse drug experience information as described in this section. Except as provided in paragraph (g)(2) of this section, these reports must be submitted to the Agency in electronic format as described in paragraph (g)(1) of this section.

. . .

**(k) Withdrawal of approval**.  If an applicant fails to establish and maintain records and make reports required under this section, FDA may withdraw approval of the application and, thus, prohibit continued marketing of the drug product that is the subject of the application.

. . .