# No. 24-1807

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CHARLES BENNETT, ex rel.,

*Plaintiff-Appellant,*

v.

BAYER CORPORATION, an Indiana Corporation; JOHNSON & JOHNSON, a New Jersey Corporation; MERCK & CO., INC., a New Jersey Corporation; JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 2:22-CV-01620
THE HONORABLE ESTHER SALAS

## BRIEF FOR DEFENDANT-APPELLEE JOHNSON & JOHNSON

S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Mark W. Mosier
Krysten Rosen Moller
Kendall T. Burchard
Eli Nachmany
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

*Counsel for Defendant-Appellee Johnson & Johnson*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Defendant Johnson & Johnson Corporation hereby states that it is a publicly held corporation, that it has no parent corporation, and that no publicly held corporation owns 10 percent or more of its stock.

## STATEMENT CONCERNING ORAL ARGUMENT

This case involves important questions regarding the proper scope of liability under the False Claims Act, 31 U.S.C. §§ 3729–3733.  Appellee Johnson & Johnson respectfully submits that oral argument would assist the Court in its resolution of this case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

INTRODUCTION ................................................................. 1

STATEMENT OF ISSUES ...................................................... 4

STATEMENT OF THE CASE................................................... 5

    A.     Regulatory Framework......................................... 5

    B.     Approval and Reimbursement of Levaquin ........................ 7

    C.     Factual Allegations and Procedural History ...................... 10

STATEMENT OF RELATED CASES AND PROCEEDINGS ........... 12

SUMMARY OF ARGUMENT ............................................... 12

STANDARD OF REVIEW .................................................. 15

ARGUMENT .................................................................. 16

I.     The District Court Correctly Held That Relator Failed to Allege That the Claims at Issue Are False. ................................... 16

    A.     Relator Did Not Plead a Viable "Fraudulent-Inducement" Claim Because He Did Not Allege a Fraudulently Induced Contract. ........................................................ 17

         1.     As at common law, the "fraudulent-inducement" theory of FCA liability requires a fraudulently induced contract. ...... 17

         2.     Neither this Court nor the Supreme Court has extended the FCA's "fraudulent-inducement" theory beyond its common law roots. ................................................ 23

    B.     Even If Relator's "Fraudulent-Inducement" Theory Were Viable, He Has Not Plausibly Alleged that J&J Made False Statements to FDA. ............................................ 29

    C.     Allowing Relator's Claim to Proceed Would Undermine FDA's Authority and Raise Serious Separation-of-Powers Concerns. ......... 34

II.     Relator Also Failed to Plead Other Elements of His FCA Claim. ............... 37

     A.     Relator Failed to Plead Causation. ...................................................... 38

     B.     Relator Failed to Plead Materiality. ................................................... 40

III.    Alternatively, This Court Should Affirm Because the FCA's Public
Disclosure Bar Warrants Dismissal. .............................................................. 43

     A.     The Public Disclosure Bar Applies Because Relator's
Allegations Are Substantially Similar to Numerous Public
Disclosures. .......................................................................................... 44

     B.     Relator Is Not an Original Source. ...................................................... 48

CONCLUSION ..................................................................................................... 51

CERTIFICATE OF COMPLIANCE ..................................................................... 52

CERTIFICATE OF BAR MEMBERSHIP ............................................................ 53

CERTIFICATE OF SERVICE .............................................................................. 54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABM Farms, Inc. v. Woods*,
  692 N.E.2d 574 (Ohio 1998) ...............................................................22

*Allison Engine Co. v. United States ex rel. Sanders*,
  553 U.S. 662 (2008)...........................................................................28

*Anderson v. Durant*,
  550 S.W.3d 605 (Tex. 2018) ..............................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................15

*In re Baycol Prods. Litig.*,
  732 F.3d 869 (8th Cir. 2013) ........................................................17, 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................15

*United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*,
  104 F.3d 1453 (4th Cir. 1997) ...........................................................30

*Betz Lab'ys, Inc. v. Hines*,
  647 F.2d 402 (3d Cir. 1981) ...............................................................21

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)...........................................................................37

*United States ex rel. Campie v. Gilead Scis., Inc.*,
  862 F.3d 890 (9th Cir. 2017) .............................................................27

*United States ex rel. Cimino v. Int'l Bus. Machs. Corp.*,
  3 F.4th 412 (D.C. Cir. 2021).......................................................*passim*

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
  587 U.S. 262 (2019)......................................................................29, 34

*D'Agostino v. EV3, Inc.*,
  845 F.3d 1 (1st Cir. 2016)........................................................36, 37, 39

*Foglia v. Renal Ventures Mgmt., LLC*,
754 F.3d 153 (3d Cir. 2014) ..............................................................16

*GlobeTec Const., LLC v. Custom Screening & Crushing, Inc.*,
77 So.3d 802 (Fla. Dist. Ct. App. 2011) ..........................................22

*Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel.*
*Wilson*,
559 U.S. 280 (2010)..................................................................3, 43

*United States ex rel. Harman v. Trinity Indus. Inc.*,
872 F.3d 645 (5th Cir. 2017) ......................................................30, 31

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) ......................................................26, 27

*Hassen v. Gov't of Virgin Islands*,
861 F.3d 108 (3d Cir. 2017) ..............................................................15

*United States ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ..........................................................27

*Hutchins v. Wilentz, Goldman & Spitzer*,
253 F.3d 176 (3d Cir. 2001) ......................................................17, 29

*Lara v. Comm'r Pa. State Police*,
91 F.4th 122 (3d Cir. 2024) ..............................................................49

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
575 F.3d 458 (5th Cir. 2009) ..............................................................23

*United States ex rel. Main v. Oakland City University*,
426 F.3d 914 (7th Cir. 2005) ..............................................................28

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943)..................................................................19, 24, 26

*United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) ......................................................16, 31, 45, 49

*MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*,
974 F.3d 386 (3d Cir. 2020) ..............................................................21

*U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
866 F.3d 29 (1st Cir. 2017).............................................28

*United States ex rel. Paulos v. Stryker Corp.*,
762 F.3d 688 (8th Cir. 2014) ...........................................47

*United States ex rel. Petratos v. Genentech, Inc.*,
855 F.3d 481 (3d Cir. 2017) .......................................*passim*

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023).........................................................35

*United States ex rel. Polansky v. Pfizer, Inc.*,
822 F.3d 613 (2d Cir 2016) .............................................35

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011) .............................................39

*United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*,
769 F.3d 837 (3d Cir. 2014) .............................................49

*SEC v. Jarkesy*,
144 S. Ct. 2117 (2024)......................................................20

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020)..........................................................34

*United States ex rel. Tessitore v. Infomedics*,
847 F. Supp. 2d 256 (D. Mass. 2012).............................33

*United States ex rel. Thomas v. Siemens AG*,
593 Fed. App'x 139 (3d Cir. 2014) ............................*passim*

*United States ex rel. Thomas v. Siemens AG*,
991 F. Supp. 2d 540 (E.D. Pa. 2014).........................38, 39

*United States v. Alcan Elec. & Eng'g, Inc.*,
197 F.3d 1014 (9th Cir. 1999) .........................................45

*United States v. Neiftert-White Co.*,
390 U.S. 228 (1968)....................................................24, 25

*United States v. Omnicare, Inc.*,
903 F.3d 78 (3d Cir. 2018) ...........................................................*passim*

*United States v. Veneziale*,
268 F.2d 504 (3d Cir. 1959) ........................................................18, 19, 22, 26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)...................................................................20, 40, 41, 42

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000).................................................................................36

*Werwinski v. Ford Motor Co.*,
286 F.3d 661 (3d Cir. 2002) ...................................................................21

*United States ex rel. Zizic v. Q2Administrators, LLC*,
728 F.3d 228 (3d Cir. 2013) ...................................................................45

## Constitutional Provision

U.S. Const. Art. II § 1 ...............................................................................34

## Statutes

False Claims Act, 31 U.S.C. § 3729 ................................................*passim*

§ 3729(a) .................................................................................................17

§ 3729(b) .................................................................................................40

§ 3730(e) .........................................................................................*passim*

§ 3731(b) .................................................................................................36

Federal Food, Drug, and Cosmetic Act, 21 U.S.C.

§ 332.........................................................................................................6

§ 333(a) .....................................................................................................6

§ 333(f).......................................................................................................6

§ 355(a) .................................................................................................5, 36

§ 355(b).......................................................................................................6

§ 355(c) ............................................................................................6, 30

§ 355(d) ..........................................................................................5, 6, 30

§ 355(e) ...........................................................................................6, 36

§ 355(o) ................................................................................................7

§ 393 ....................................................................................................5

42 U.S.C. § 1395 .....................................................................................7

**Regulations**

21 C.F.R.

§ 10.30................................................................................................6

§ 312.23...............................................................................................5

§ 314.50.............................................................................................5, 32

§ 314.80................................................................................................6

§ 314.81................................................................................................6

§ 314.105..............................................................................................6

§ 314.125.........................................................................................6, 30

42 C.F.R. § 423.100 .................................................................................7

70 Fed. Reg. 4194 (Jan. 28, 2005) ..............................................................7

**Treatises**

28 Williston on Contracts § 70:220 (4th ed. May 2024 update) .............................21

37 Am. Jur. 2d Fraud & Deceit § 2...........................................................20, 21

37 C.J.S. Fraud § 111 (June 2021 update) ......................................................21

**Government Database**

*Drugs@FDA (levofloxacin)*, FDA.gov,
     https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm ..............................10

# INTRODUCTION

For years, Relator Charles Bennett complained to the federal government about how Defendant Johnson & Johnson ("J&J") disclosed the potential side effects of Levaquin. Relator took issue with J&J's decision to include a list of specific side effects on Levaquin's label, rather than to group those potential effects together. In Relator's view, J&J's "disaggregation" of psychiatric and neurological side effects fraudulently masked their true prevalence.

Relator's complaints failed to convince the federal government to take any action relevant here. In response to several citizen petitions, the Food and Drug Administration ("FDA") declined to withdraw its approval for Levaquin, and the Centers for Medicare and Medicaid Services ("CMS") continued to pay for the drug. And in response to this *qui tam* suit under the False Claims Act ("FCA"), 31 U.S.C. § 3729, the Department of Justice declined to intervene and pursue these claims.

Relator nevertheless continued to pursue this suit. Invoking the "fraudulent-inducement" theory of FCA liability, Relator alleged that J&J fraudulently induced FDA to approve Levaquin in 1996, and, as a result, every claim submitted to the government for Levaquin *for the past three decades* is a false claim. On this theory, Relator could impose massive liability on J&J by convincing a jury to disagree with FDA's decision to approve Levaquin and with CMS's decisions to reimburse for Levaquin.

The district court correctly declined to interpret the FCA to include such a broad and unconstitutional delegation of executive power to private individuals. The court dismissed Relator's claims because the fraudulent-inducement theory applies only when a relator alleges a fraudulently induced contract, which Relator does not allege here. Relator and the Government call this a "novel limitation" on the fraudulent-inducement theory, but that limitation is firmly rooted in the common law. Neither the Supreme Court nor this Court has ever extended the fraudulent-inducement theory of FCA liability beyond fraudulently induced contracts, and with good reason: it would be inconsistent with the FCA's plain text and exceed the common law's limitations on fraudulent-inducement claims. Both would exacerbate the constitutional problems inherent in *qui tam* suits.

The district court also correctly held that, even if the fraudulent-inducement theory applied to FDA's drug approvals, Relator did not adequately allege that J&J fraudulently induced FDA to approve Levaquin. Relator does not allege that J&J failed to comply with any statutory, regulatory, or contractual requirements. He faults J&J for including a list of specific side effects on the FDA-approved label for Levaquin. But he does not allege that FDA regulations required J&J to aggregate the side effects on the label. Nor does he allege that the Levaquin label's list of side effects contained any false information. Without any plausible allegation that J&J defrauded FDA to gain approval of Levaquin, Relator's claims necessarily fail.

Relator's complaint is also defective in multiple other respects, any of which would be independent grounds for affirmance. Relator has not pleaded the causation or materiality elements of an FCA claim because, even after learning everything that Relator claims J&J omitted or misrepresented, FDA did not pull Levaquin (or generic equivalents) from the market, and CMS continued reimbursing claims for the drug.

Relator's complaint is also barred by the public disclosure bar. By the time Relator submitted his supposedly original research, FDA was already aware that Levaquin and other fluoroquinolone antibiotics could have neurological side effects. Indeed, Relator's "research" largely parroted the findings of public FDA studies. As a result, the FCA's public disclosure bar prohibits this action, and Relator is not an original source of these disclosures.

In enacting and amending the FCA, Congress sought to encourage whistleblowers to reveal hidden frauds while at the same time thwarting "opportunistic plaintiffs" from bringing "parasitic lawsuits." *Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294-95 (2010). This action—which is premised on allegations ripped from FDA's own reports and reduces to little more than Relator's disagreement with the FDA's expert judgment about Levaquin's safety and efficacy—is the quintessential "parasitic" lawsuit that Congress sought to stifle. The District Court's judgment should be affirmed.

# STATEMENT OF ISSUES

1.    Whether the district court correctly held that Relator failed to allege that claims for reimbursement of Levaquin are false when Relator relied on a fraudulent-inducement theory, but did not allege either a fraudulently induced contract or that J&J made false statements to gain approval of Levaquin.

2.    Whether Relator's claims should be dismissed for failure to plead causation and materiality when, after learning of the alleged fraud, FDA did not withdraw its approval of Levaquin, and CMS continued to pay for the drug.[1]

3.    Whether Relator's complaint should be dismissed under the public disclosure bar because its allegations are substantially similar to information that had been publicly disclosed before this suit was filed, and Relator was not an original source of that information.[2]

---

[1] J&J preserved this argument by raising it in the briefing below. *See, e.g.*, A-32 (ECF No. 38-1 pp. 23-28); A-35 (ECF No. 68-1 pp. 20-24 & n.18); A-37 (ECF No. 83 p. 2). In dismissing Relator's First Amended Complaint, the district court held that Relator failed to plead materiality, *see* A-242-A-249, but did not consider causation. In dismissing Relator's Second Amended Complaint, the district court did not address either element. A-21 n.4.

[2] J&J preserved this argument by raising it in the briefing below. A-32 (ECF No. 38-1 pp. 9-16); A-35 (ECF No. 68-1 pp. 26-29); A-37 (ECF No. 83 p. 2). The district court did not decide the issue. A-16 n.3; A-237.

# STATEMENT OF THE CASE

## A.    Regulatory Framework

Federal law creates a comprehensive statutory and regulatory framework governing drug approval, labeling, and reimbursement.

Drug approval is governed by the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355, *et seq.*  Through this statute, Congress delegated to the FDA the authority to approve for market drugs that are "safe and effective" for their intended use.  A-267 ¶ 49; *see also* 21 U.S.C. § 393(b)(2)(B); 21 U.S.C. § 355(a), (d).

FDA's drug approval process is lengthy and rigorous, involving a "multi-year process of studying and testing."  A-268 ¶ 51.  To apply for approval of a medicine, pharmaceutical companies like J&J generally must conduct extensive laboratory studies testing how the proposed medicine works and assessing its safety.  A-268-A-270 ¶ 52; *see also* 21 C.F.R. § 312.23(a)(8).  If the results indicate that the drug is safe and effective, the company submits an investigational New Drug Application ("NDA") to FDA.  21 U.S.C. § 355(a).  An NDA must include detailed technical information, including proposed labeling, the drug's intended use and clinical benefits, a summary of clinical data, and statistical analysis of its efficacy.  A-270 ¶ 53; *see also* 21 C.F.R. § 314.50.  NDAs often exceed 100,000 pages in length and must include (among other things) "full reports of investigations which have been

made to show whether such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

FDA will approve the drug if, after close scrutiny of the application, "it determines that the drug meets the statutory standards for safety and effectiveness, manufacturing and controls, and labeling." 21 C.F.R. §§ 314.105(c), (d). Conversely, FDA may deny approval for many reasons, including if "there is insufficient information about the drug to determine whether [it] is safe for use under the conditions prescribed, recommended, or suggested in its proposed labeling." 21 C.F.R. § 314.125(b)(4); *see also* 21 U.S.C. §§ 355(c)(1)(A), (d). If FDA finds that an applicant failed to disclose relevant safety information, the agency may pursue sanctions, including withdrawal of approval for the drug, injunctive relief, civil monetary penalties, and referral for criminal prosecution. *See* 21 U.S.C. §§ 332, 333(a), 333(f)(3)(A), 355(e).

FDA continues monitoring the drug's safety and efficacy after the drug is approved. Drug manufacturers must file post-marketing reports of "[a]dverse drug experience[s]" with FDA, as well as other information that "might affect the safety, effectiveness, or labeling of the drug." 21 C.F.R. §§ 314.80-81. Third parties that believe that FDA has not considered certain safety information about the drug can also petition FDA to take administrative action. *See* 21 C.F.R. § 10.30 (outlining citizen petition process). FDA collects these reports and others in an online database

called the FDA Adverse Event Reporting System ("FAERS") that supports FDA's post-marketing surveillance program for approved pharmaceutical products. FDA may also request changes to a drug's label if it becomes aware of new safety information. *See* 21 U.S.C. § 355(o)(4).

Congress delegated to CMS authority to make decisions about whether Medicare and Medicaid will reimburse medication. *See* 42 U.S.C. § 1395 *et seq.*; *id.* § 1396 *et seq.* Under Medicare Part D—the Medicare program that would reimburse for Levaquin—a drug is eligible for reimbursement if it is prescribed for a "medically accepted indication." 42 C.F.R. § 423.100; *see also* 70 Fed. Reg. 4194, 4228 (Jan. 28, 2005) (defining Medicate Part D drugs). This determination is made based on a patient's specific diagnosis or condition, and thus is made independently of FDA's decision to approve a drug. *See United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 487-88 (3d Cir. 2017).

### B. Approval and Reimbursement of Levaquin

Nearly three decades ago, J&J developed, and FDA approved, Levaquin (levofloxacin), a fluoroquinolone ("FQ") antibiotic used to treat a variety of infections, such as lung infections, sinus infections, skin infections, and urinary tract infections. A-256, A-267. Developing the drug required extensive clinical trials and FDA review, which spanned more than four years. A-256, A-267.

J&J presented to FDA its initial proposed clinical development plan for Levaquin on February 11, 1992. A-355. FDA provided input on that plan, and J&J submitted a revised plan on April 29, 1994. A-355. J&J and FDA also communicated about J&J's development of an NDA for Levaquin, including the parameters of clinical trials of the drug. A-355. Following this lengthy and rigorous process, J&J submitted an NDA for Levaquin on December 21, 1995. A-350.

As part of FDA's approval process, multiple FDA clinical reviewers provided feedback on the Levaquin NDA and its underlying data. A-354. J&J amended the NDA to incorporate this feedback. A-346. On December 20, 1996, FDA approved Levaquin for use in the United States. A-346.

Like many medications, FQs can cause adverse effects in some patients. And since approving Levaquin, FDA has approved labeling changes and new warnings for Levaquin and other FQs. A-288-A-289. These have included warnings about the risks of tendinitis and tendon rupture, symptoms for myasthenia gravis, serious nerve damage, mental health side effects, and serious blood sugar disturbances. A-59. Each time FDA approved a labeling change, J&J timely incorporated that change onto Levaquin's label, and CMS continued to reimburse claims for the medication.

Some of these labeling changes followed a 2013 study by an FDA official, Dr. Deborah Boxwell. A-282. Dr. Boxwell's study found adverse neurological and

psychological effects in some patients who used FQs.  A-283.  Dr. Boxwell labeled these adverse effects as fluoroquinolone-associated disabilities ("FQADs").

Based on Dr. Boxwell's findings, Relator submitted a Citizen Petition to FDA on June 18, 2014, in which he requested that FDA make certain changes to Levaquin's labeling.  A-284.  Less than three months later, Relator submitted a second petition citing his own research, including with patients whom Relator claims suffered serious side effects.  A-284.  Dr. Boxwell and Relator both reported their findings about FQ side effects to two FDA committees on November 5, 2015.  A-286.

FDA denied Relator's first petition, but it stated that it had "taken action to require certain changes to the labeling of Levaquin and other systemic fluoroquinolone antibacterial drugs to reflect new safety information."  A-512.  FDA thereafter responded to Relator's second petition by granting one of his requests for a labeling change and denying the rest of his requests.  A-470.  FDA deemed these labeling changes sufficient to address these safety concerns, and it did not revoke its approval of Levaquin or pursue other sanctions.  CMS continued reimbursing claims for Levaquin.

When Relator submitted another request for labeling changes in 2019, FDA also denied that request on the ground that the approved labeling "adequately communicated" the risks of the drug.  A-11.  By this time, J&J had discontinued

production of Levaquin. A-10-A-11. But generic levofloxacin remains on the market pursuant to numerous FDA drug approvals.[3]

## C. Factual Allegations and Procedural History

Relator claims that J&J fraudulently induced FDA to approve Levaquin nearly three decades ago. On June 9, 2017, Relator filed this *qui tam* suit under the FCA against Bayer Corporation and Merck & Co., Inc. A-40. Relator later filed a First Amended Complaint adding J&J and related defendants. A-138. That complaint alleged that J&J was liable under an implied-false-certification theory, *i.e.*, that J&J violated the FCA because it allegedly "caused others to submit a claim for reimbursement under Medicaid and Medicare without disclosing that … Levaquin failed to comply with applicable law." A-238. The United States declined to intervene in Relator's suit. A-212.

In response to the Defendants' motion to dismiss, Relator abandoned an implied-certification theory and instead argued that claims submitted to Medicare and Medicaid were "false" because defendants had allegedly fraudulently induced FDA to approve their drugs. A-239. The district court concluded that Relator had not alleged facts supporting that newly raised theory, and it dismissed the First

---

[3] *See Drugs@FDA (levofloxacin)*, FDA.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm (last accessed Aug. 8, 2024).

Amended Complaint for failure to state a claim. A-227. The court held that Relator failed to allege either the falsity or materiality elements on his FCA claim. A-227.

Relator again amended his complaint, this time attempting to plead a fraudulent-inducement theory. A-252. The district court dismissed Relator's Second Amended Complaint on April 4, 2024. A-3. The court concluded that Relator again failed to plead falsity. As the court explained, Relator's fraudulent-inducement theory of FCA liability exceeds "the boundaries established by the Third Circuit" in FCA cases, given that "Relator fails to demonstrate that any *contractual relationship* exists as a result of the alleged false or fraudulent statements." A-19.

The court also held that Relator "fail[ed] to establish a 'strong inference' that Defendants misrepresented or omitted any required disclosures, or, that any false or fraudulent statements were knowingly made by … J&J to the FDA to get … Levaquin approved." A-20. The court determined that defendants had no obligation to disclose any omitted information and that "Relator's numerous Citizen Petitions and FDA responses[] demonstrate that the FDA was made aware of all the information put forth in the Second Amended Complaint." A-21. The court declined to exercise supplemental jurisdiction over Relator's state-law claims and dismissed Relator's suit.[4] A-21.

---

[4] Relator does not challenge on appeal the dismissal of his state-law claims.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Defendants are not aware of any related cases or proceedings.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held, for two independent reasons, that Relator failed to allege that claims for reimbursement of Levaquin were false. Relator's "fraudulent-inducement" theory is not viable because he did not allege a fraudulently induced contract. And even if it were a viable theory, Relator has not adequately alleged that J&J made false statements to obtain FDA approval of Levaquin.

**A.** The fraudulent-inducement theory of FCA liability applies only where the relator alleges a fraudulently induced contract. The text of the FCA imposes liability for "false" claims. Despite this statutory requirement, the fraudulent-inducement theory allows a relator to plead FCA liability without alleging a false claim. Courts have justified this result by putting a "common-law gloss" on the statutory text. But the common-law gloss on a federal statute can extend only as far as the common law. At common law, fraudulent inducement was limited to fraudulently induced contracts. Consistent with this common-law tradition, this Court and the Supreme Court have applied the fraudulent-inducement theory of FCA liability only where the relator alleges a fraudulently induced contract. To hold otherwise would turn the FCA into an all-purpose antifraud statute, contrary to the Supreme Court's express instructions.

**B.**    The district court also correctly held that, even if the fraudulent-inducement theory could be extended beyond contracts to inducement of agency action, Relator has not adequately alleged that J&J fraudulently induced FDA to approve Levaquin.  Relator alleged that J&J withheld certain adverse event data from its NDA, but he failed to allege that J&J was required to disclose the information it allegedly withheld.  Relator also alleged that J&J fraudulently provided "disaggregated" data to FDA, instead of "aggregated" data.  But he does not plausibly allege that the method J&J used to present its data was false, misleading, or contrary to any FDA requirements, and in any event, Levaquin's NDA approval package did in fact contain "aggregated" data.

**C.**    Adopting Relator's theory would undermine FDA's drug-approval authority and would raise significant separation-of-powers concerns.  It would allow private relators and lay juries to second-guess drug-approval decisions that Congress has delegated to FDA.  And Relator's theory would exacerbate constitutional problems inherent in the *qui tam* procedure, because it would allow private citizens to exercise executive powers that Article II vests in the President.  That result would be not only bad policy, but also unconstitutional.

**II.**    Relator also failed to state a claim because he did not allege either causation or materiality, two required elements of his FCA claim, plausibly or with particularity.

**A.** To plead causation, Relator must allege a causal link between J&J's alleged false statements and reimbursement claims for Levaquin. Because Relator has pursued a fraudulent-inducement theory, he must allege that J&J's purportedly false statements were the but-for cause of FDA's decision to approve Levaquin. Relator has not plausibly, or with particularity, made this allegation. Nor could he. Causation is necessarily absent here given the fact that FDA has maintained its approval of Levaquin and its generic equivalents after learning all the information that Relator claims J&J misrepresented or omitted.

**B.** Relator also failed to plead materiality. To plead this element, Relator needed to allege that CMS would not have paid for Levaquin had it known of J&J's alleged false statements to FDA. This Court has previously held that a relator failed to allege materiality when CMS continued to pay claims for a drug after the alleged fraud was revealed. *See Petratos*, 855 F.3d at 490. The same is true here. CMS continued to pay claims for Levaquin even after Relator's allegations became public.

**III. A.** This Court can also affirm for the independent reason that the FCA's public disclosure bar requires dismissal of Relator's claims. This bar "disallows *qui tam* actions that rely on allegations that are, at least in substantial form, already known to the public." *United States v. Omnicare, Inc.*, 903 F.3d 78, 81 (3d Cir. 2018). Relator's FCA claim is barred because his factual allegations are

"substantially similar" to—indeed, they almost wholly reprise—prior disclosures about Levaquin in FDA reports and other public documents.

**B.**   Nor can Relator avoid the public disclosure bar by claiming to be an "original source" of the public disclosures.   Relator argues that he is an "original source" because of his SONAR Network research and his scientific work with mice, but this information did not "materially add" to the publicly disclosed information. Far from being an original source, Relator brought the archetypal "parasitic lawsuit" that the public disclosure bar was enacted to prevent.

## STANDARD OF REVIEW

This Court "exercise[s] plenary review" of a district court's order granting a motion to dismiss.   *Petratos*, 855 F.3d at 486 (citation omitted).   Because this Court's "review is plenary," it "may affirm on any grounds supported by the record." *Hassen v. Gov't of Virgin Islands*, 861 F.3d 108, 114 (3d Cir. 2017) (cleaned up).

"To survive a motion to dismiss," Relator's Second Amended Complaint needed to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.*

Relator's FCA claim is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Omnicare*, 903 F.3d at 91. Under Rule 9(b), a relator must allege with particularity "the who, what, when, where and how of the events at issue." *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (cleaned up); *see also Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (Rule 9(b) requires a relator to "allege particular details of a scheme to submit false claims").

## ARGUMENT

## I. The District Court Correctly Held That Relator Failed to Allege That the Claims at Issue Are False.

"A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality." *Petratos*, 855 F.3d at 487. The district court correctly held that Relator failed to plead falsity for two independent reasons. *First*, Relator pleaded his claim based on a fraudulent-inducement theory, but that theory applies only where—unlike here—the relator alleges a fraudulently induced contract. *Second*, even if the fraudulent-inducement theory were viable without a fraudulent contract, Relator's claim would fail because he has not adequately alleged that J&J knowingly made false statements to get Levaquin approved. This Court may affirm the dismissal of Relator's claim on either ground.

**A.** **Relator Did Not Plead a Viable "Fraudulent-Inducement" Claim Because He Did Not Allege a Fraudulently Induced Contract.**

The district court held that a relator must allege a fraudulently induced contract to state a FCA claim based on a fraudulent-inducement theory. A-19-A-20. Contrary to the Government's assertion, the court did not impose a "novel limitation on the fraudulent indument theory." U.S. Amicus Br. 23. This limitation comes directly from the common law. Courts have allowed relators to proceed on a fraudulent-inducement theory by putting a common-law gloss on the FCA's text. But that gloss is necessarily limited by the common law, which recognizes fraudulent-inducement claims only in the context of fraudulently induced contracts—not, as Relator would have it, whenever a false statement induces the government to act.

**1.** **As at common law, the "fraudulent-inducement" theory of FCA liability requires a fraudulently induced contract.**

The FCA imposes liability for presenting, or causing to be presented, "a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Based on this statutory text, this Court has observed that the FCA "was not intended to impose liability for every false statement made to the government." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184 (3d Cir. 2001). Rather, "the focus of the False Claims Act is on false 'claims.'" *United States ex rel. Thomas v. Siemens AG*, 593 Fed. App'x 139, 143 (3d Cir. 2014); *accord In re Baycol Prods. Litig.* 732 F.3d

869, 875 (8th Cir. 2013) (FCA attaches liability "not to the underlying fraudulent activity, but to the claim for payment").

In most FCA cases, the relator attempts to plead the falsity requirement by alleging that claims submitted to the government are factually or legally false.[5] After unsuccessfully alleging that the claims here were legally false, A-239-A-242, Relator abandoned any allegation that the claims themselves were false. Relator Br. 15 (conceding that the claims here are not "facially false").

Relator instead proceeds solely on a fraudulent-inducement theory. *See id.* at 14. Under that theory, a relator may "establish liability under the [FCA] for each claim submitted to the government *under a contract which was procured by fraud*, even in the absence of evidence that the claims were fraudulent in themselves." *Thomas*, 593 Fed. App'x at 143 (emphasis added); *see also United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) (a claim is treated as false if it is submitted pursuant to *"a fraudulently induced contract …* when that contract later results in payment thereunder by the government" (emphasis added)).

---

[5] A claim is "factually false" when "the claimant misrepresents what goods or services that it provided to the Government" and "legally false" when the claimant falsely certifies that it has complied "with a statute or regulation the compliance with which is a condition for Government payment." *Petratos*, 855 F.3d at 486 & n.1 (cleaned up).

This Court and others have acknowledged the tension between the statutory text, which requires that the claims themselves are false, and the fraudulent-inducement theory, which does not require anything about the claims to be false. *See, e.g.*, *Thomas*, 593 Fed. App'x at 143 ("Although the focus of the False Claims Act is on false 'claims,'" fraudulent-inducement theory imposes liability "even in the absence of evidence that the claims were fraudulent in themselves"); *United States ex rel. Cimino v. Int'l Bus. Machs. Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2021) (same).

Courts have justified interpreting the FCA to include a fraudulent-inducement theory by interpreting the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), as "plac[ing] a common law gloss on the statute." *Cimino*, 3 F.4th at 417; *see also Veneziale*, 268 F.2d at 505 (applying fraudulent-inducement theory based on *Hess*).[6] In *Hess*, the Supreme Court held that "a violation of the FCA occurs when a person fraudulently induces the government to enter a contract and later submits claims for payment under that contract." *Cimino*, 3 F.4th at 417.

---

[6] This interpretive approach has recently been criticized as inconsistent with the Supreme Court's more recent FCA decisions, which interpret the statutory text as written. *See Cimino*, 3 F.4th at 425-26 (Rao, J., concurring) (questioning whether *Hess* justifies expanding FCA liability beyond the statutory text).

Even if the FCA incorporates this common-law gloss, that gloss necessarily extends only as far as the common law. As the Supreme Court recently explained, when Congress "transplants" a common-law doctrine into a federal statute, "the old soil comes with it." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2130 (2024) (cleaned up). Thus, when Congress prohibited the making of "false or fraudulent" claims, it incorporated the "well-settled meaning of the common-law terms it use[d.]" *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (cleaned up).

The D.C. Circuit recently applied this principle to the fraudulent-inducement theory and rejected a relator's attempt to relax the FCA's causation requirement for such claims. *See Cimino*, 3 F.4th at 419. As the court explained, "claims for fraudulent inducement rest not on the text of the FCA, but on the recognition that the statute encompasses this common law claim, along with its common law requirements, which include causation." *Id.*; *see also id.* at 421 (relator "presented no compelling reason to deviate from the ordinary common law rule").

Likewise, the fraudulent-inducement theory of FCA liability requires a relator to allege a fraudulently induced contract, because that limitation is firmly rooted in the common law. Fraudulent inducement—or "[f]raud in the inducement"—"is a subset of the tort of fraud." 37 Am. Jur. 2d Fraud & Deceit § 2. "Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to

enter a contract." 37 C.J.S. Fraud § 111 (June 2021 update). As a leading treatise on *contract* law explains, "[f]raudulent inducement is such fraud in procurement of the execution of an instrument as results in the signer's being ignorant of the nature of the instrument which is being signed." 28 Williston on Contracts § 70:220 (4th ed. May 2024 update); *see also, e.g.*, 37 Am. Jur. 2d Fraud & Deceit § 2 ("A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation."). By its very terms, "fraudulent inducement" requires a contract, as a contract is what the plaintiff is allegedly "fraudulently induced" to enter. Otherwise, the plaintiff simply alleges fraud.

This Court's prior decisions addressing common-law fraudulent-inducement claims have consistently described the claim by reference to the fraudulently induced contract. *See, e.g.*, *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 405 (3d Cir. 2020) ("Fraud in the inducement occurs when someone signs the document they intended to sign, but their assent was induced by a material misrepresentation about facts external to that document."); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 676 (3d Cir. 2002) ("Fraud in the inducement presents a special situation where parties to a contract negotiate freely … but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.") (cleaned up); *Betz Lab'ys, Inc. v. Hines*, 647 F.2d 402, 404 n.1 (3d Cir. 1981) ("court defined 'fraud in the

inducement' as the situation where a 'party was enticed into the contract by some misrepresentation made by the opposing party'" (citation omitted)).[7]

Given this common-law understanding of the term, it is unsurprising that this Court's prior decisions have described the fraudulent-inducement theory of FCA liability by reference to "a fraudulently induced contract." *Veneziale*, 268 F.2d at 505 ("a fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government"); *see also Thomas*, 593 Fed. App'x at 143 ("courts have employed a fraudulent inducement theory to establish liability under the [FCA] for each claim submitted to the government under a contract which was procured by fraud").

Other courts of appeals have similarly understood the fraudulent-inducement theory of FCA liability as applicable to fraudulently induced contracts. *See, e.g.*, *Cimino*, 3 F.4th at 419 ("[E]ach claim submitted to the Government under a contract

---

[7] State courts, in expounding the common law of their respective states, are often explicit in holding that a common-law fraudulent-inducement claim requires a fraudulently induced contract. *See, e.g.*, *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (because "[f]raudulent inducement is a species of common-law fraud that … arises only in the context of a contract, the existence of a contract is an essential part of its proof"); *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998) ("A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract."); *GlobeTec Const., LLC v. Custom Screening & Crushing, Inc.*, 77 So.3d 802, 803 (Fla. Dist. Ct. App. 2011) ("axiomatic that where there is no contract … [plaintiff] cannot possibly demonstrate inducement")

which was procured by fraud is false even in the absence of evidence that the claims were fraudulent in themselves" (cleaned up)); *In re Baycol Prods. Litig.*, 732 F.3d at 876 ("[W]hen a relator alleges liability under a theory of fraud-in-the inducement, claims for payment subsequently submitted under a contract initially induced by fraud do not have to be false or fraudulent in and of themselves in order to state a cause of action under the FCA."); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467-68 (5th Cir. 2009) ("FCA liability may be imposed 'when the contract under which payment is made was procured by fraud.'").

Given this common-law history, the district court correctly required Relator to allege a fraudulently induced contract to state a FCA claim under a fraudulent-inducement theory. Because Relator has not alleged any such contract, his claim necessarily fails.

      **2.**      **Neither this Court nor the Supreme Court has extended the FCA's "fraudulent-inducement" theory beyond its common law roots.**

Relator and the Government do not grapple with either the statutory text or common law. They do not offer any interpretation of the FCA's text that would include the fraudulent-inducement theory. Nor do they acknowledge that, at common law, a claim of fraudulent inducement necessarily presumed that what was "induced" was a contract. Instead, they principally argue that the fraudulent-inducement theory should not be limited to contracts because courts—including this

Court and the Supreme Court—have already extended the theory beyond fraudulent contracts. Relator and the Government mischaracterize the case law.

*First*, the Government contends that the district court's decision "is inconsistent with decades of Supreme Court precedent on fraudulent inducement claims." U.S. Amicus Br. 11. But stripped of the hyperbole, this argument reduces to the assertion that the district court's decision is inconsistent with two Supreme Court decisions issued more than 50 years ago: *Hess* and *United States v. Neiftert-White Co.*, 390 U.S. 228 (1968). The district court's decision does not conflict with either of those decisions.

*Hess* cannot be read as adopting a fraudulent-inducement theory untethered from its common-law roots. It is instead the basis for putting a common-law gloss on the FCA. *See Cimino*, 3 F.4th at 419. In *Hess*, deceitful contractors "caused the government to pay claims" under a collusive contract that was "the result of the fraudulent bidding." 317 U.S. at 543. The Court explained that the government "would never have" rendered payment had it known that the contracts were obtained through collusive bids. *Id.* Because "every step" the government took after the "initial fraudulent action"—and "every dollar paid"—was "taint[ed]" by the collusion, FCA liability attached because the contractors' fraud caused the Government to enter a contract, under which claims for payment were submitted in violation of the FCA. *Id.*

*Neifert-White* is also no help to Relator. There, the "narrow and precise" question before the Court was the proper interpretation of "claim" under the FCA. 390 U.S. at 230. Relying on "the history and the language of the False Claims Act," the Court held that "claims" could include false information used to support an application for a federal loan. *Id.* at 232. The decision did not even address the fraudulent-inducement theory.

*Neiftert-White* warned courts against adopting a "rigid, restrictive reading" of the FCA. *Id.* But that is hardly what happened here. The FCA has already been interpreted liberally to adopt a fraudulent-inducement theory by putting a common-law gloss on the text. *See Cimino*, 3 F.4th at 419. It is hardly a "rigid, restrictive reading" of the FCA to hold, as the D.C. Circuit did, that the common-law gloss contains the same limitations found in the common law. *See id.* (rejecting argument that, to further the purpose of the FCA, the statute should be construed more liberally than the common law).[8]

*Second*, the Government—but not Relator—contends that this Court has already extended the fraudulent-inducement theory beyond fraudulent contracts.

---

[8] The Government incorrectly asserts that "so long as there is a sufficient causal nexus between the defendant's fraud and the request for payment," "[t]he way in which a claim is ultimately presented to the government is irrelevant." U.S. Amicus Br. 22. Were that the case, it would collapse the FCA elements of falsity of the claim and causation into one, in contravention of the statutory scheme.

U.S. Amicus Br. 18 (citing *Petratos*, 855 F.3d at 485-86).  But *Petratos* does not mention the fraudulent-inducement theory of FCA liability.  855 F.3d at 485.  It did not cite this Court's fraudulent-inducement cases, *Veneziale* or *Thomas*.  And it cited *Hess* only in the context of rejecting the relator's argument that he sufficiently pleaded materiality.  *See* 855 F.3d at 492 (citing *Hess*, 317 U.S. at 542-43).

Rather than pursuing a fraudulent-inducement theory, the relator in *Petratos* alleged that the reimbursement claims were "legally false."  855 F.3d at 486-87.  The relator alleged that prescribing physicians made false certifications that prescriptions were "reasonable and necessary"—a requirement for reimbursement under Medicare Part B—thus rendering those reimbursement claims "false" under the FCA.  *Id.* *Petratos* was thus a typical FCA case in which a relator alleges that the Government paid "legally false" claims based on a false certification that the claim was eligible for reimbursement.  It did not address fraudulent inducement.

*Third*, Relator and the Government cite decisions from other courts of appeals that they contend applied the fraudulent-inducement theory where a fraudulent contract was not at issue.  But none of the cases expressly extend the fraudulent-inducement theory beyond contracts, much less offer any justification for doing so.

Relator cites *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), to suggest that the FCA should be construed to impose liability for fraudulent inducement outside of contracts.  Relator Br. 16.  But

*Westinghouse* itself describes FCA's "fraud-in-the-inducement" theory with reference to claims "submitted to the government under a contract" and explains that "False Claims Act liability attached … because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." 176 F.3d at 787-88.

Similarly, the Government incorrectly argues that *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890 (9th Cir. 2017), supports its position that FCA's fraudulent-inducement theory extends beyond contracts. U.S. Amicus Br. 20. *Campie* recognizes, however, that under that theory "'liability will attach to each claim submitted to the government under a contract, when the contract or extension of the government benefit was originally obtained through false statements or fraudulent conduct.'" 862 F.3d at 902 (cleaned up). Even if *Campie* applied the fraudulent-inducement theory where a contract was not at issue, the court did so without acknowledging as much, or explaining why that approach was consistent with the statutory text.[9]

---

[9] The Government also cites the Ninth Circuit's earlier decision in *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006). But *Hendow* also described the fraudulent-inducement theory in terms of inducing a contract. *Id.* at 1173 (fraudulent-inducement theory applies to "each claim submitted to the government under a contract").

The same is true of *United States ex rel. Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005). U.S. Amicus Br. 16. There, the defendant allegedly made false representations to the government to secure eligibility for later participation in student loan and grant programs. 426 F.3d at 916. Because the university's eligibility for participating in those later student loan and grant programs was "contingent on following a regulation," the university's departure from those regulations represented a breach of contract. *Id.* at 917. Neither *Main* nor any of the Government's other cases support extending the fraudulent-inducement theory beyond fraudulently induced contracts.[10]

*Fourth*, Relator and the Government selectively quote cases to suggest that that the FCA should be interpreted so broadly as to reach all fraud against the Government. *See, e.g.*, Relator Br. 16; U.S. Amicus Br. 15. But this Court and the Supreme Court have already rejected that all-encompassing approach. The Supreme Court has stressed that the FCA is not an "all-purpose antifraud statute," *Allison*

---

[10] Relator—but not the Government—relies on *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29 (1st Cir. 2017), but that decision does not help him. Relator Br. 20. The *Nargol* court affirmed the dismissal of a fraudulent-inducement claim without addressing whether the theory requires a fraudulently induced contract. Relator cites several district court decisions that he alleges have extended the theory beyond fraudulent contracts. *See* Relator Br. 18-19. But none of the decisions attempt to justify that approach. They do not interpret the statutory language to cover the fraudulent-inducement theory. Nor do they identify any basis in the common law to expand the statutory gloss on the FCA.

*Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008), instead

finding its application constrained by its text, *e.g.*, *Cochise Consultancy, Inc. v.

United States ex rel. Hunt*, 587 U.S. 262, 268-72 (2019) ("the clear text of the statute

controls this case"). This Court has similarly held that the FCA "was not intended

to impose liability for every false statement made to the government." *Hutchins*,

253 F.3d at 184. The Court should therefore reject Relator and the Government's

attempts to expand the fraudulent-inducement theory beyond its common-law roots.

**B.** **Even If Relator's "Fraudulent-Inducement" Theory Were Viable, He Has Not Plausibly Alleged that J&J Made False Statements to FDA.**

The district court also correctly dismissed Relator's claim for failure to plead

any false statements that could support a fraudulent-inducement theory, even if that

theory were viable. *See* A-19. Relator contends that "FDA was induced to grant

[Levaquin's] approval through fraud," Relator Br. 21, but he did not adequately

allege that J&J made false statements or omissions to FDA in obtaining approval of

Levaquin.

Relator alleges that J&J fraudulently induced FDA to approve Levaquin in

two ways: (1) by "withholding data" from Levaquin's NDA regarding its

"neurological and psychiatric effects," Relator Br. 11; and (2) by providing

disaggregated data to FDA, instead of aggregated data, *id.* at 31-33. Neither theory

is sufficient to allege falsity.

*First*, to allege falsity based on an alleged omission, Relator must allege that J&J had a duty to disclose the allegedly omitted data in Levaquin's NDA. *See United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 667 n.90 (5th Cir. 2017) (FCA "does not contain an independent duty to disclose certain information," and liability may only attach "where the defendant has an obligation to disclose omitted information"); *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997) ("There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information.").

The district court recognized that J&J was required to make many disclosures as part of the NDA process, including disclosures about the drug's safety. *See* A-20. But, as the district court held, Relator has not alleged that J&J violated any of the regulations imposing NDA-disclosure obligations. *See* A-20-A-21. Nor would such an allegation be plausible. Relator acknowledges that, after FDA's "multi-year process of study and testing" J&J's NDA, FDA approved Levaquin despite FDA's statutory and regulatory obligation to deny an NDA if it lacks sufficient information. *See* A-267 ¶ 47; A-268 ¶ 51; A-270 ¶ 53; *see also* 21 U.S.C. § 355(c)(1)(A), (d); 21 C.F.R. § 314.125(b)(4).

Relator contends that the district court erred in requiring him to allege that J&J "omitted information specifically requested by the FDA." A-21. According to Relator, the district court misstated the law because "the onus is *never* on the FDA

to ask the 'right' questions for 'any specific information.'" Relator Br. 24. But the district court did not require FDA to ask the "right questions"; it merely applied the settled principle that, to pursue an omission-based FCA claim, a relator must allege that "the defendant has an obligation to disclose omitted information." A-21 (quoting *Harman*, 872 F.3d at 667 n.90). And Relator did not allege that J&J violated any FDA regulation by failing to make a required disclosure.

In any event, Relator has not pleaded this omission theory with the particularity required by Federal Rule of Civil Procedure 9(b). Relator makes the conclusory allegation that J&J must have learned of Levaquin's "neurological and psychiatric effects" when conducting clinical trials "in the late 1980s and 1990s." A-285 ¶ 82. But he does not specify *what* J&J learned in those trials, *when* J&J incurred the obligation to disclose the information, *who* knew that the information was required to be disclosed, or *how* the decision was made not to disclose it. Relator's omission theory thus does not satisfy Rule 9(b)'s particularity requirement. *See, e.g.*, *Moore*, 812 F.3d at 307 (Rule 9(b) requires relator to allege "the who, what, when, where and how of the events at issue").

*Second*, Relator contends that J&J "manipulated its [NDA] data" by "intentionally disaggregat[ing] individual symptom[s]" to hide the full scope of Levaquin's negative "neurological and psychiatric effects." A-271-A-277 ¶¶ 58-68; *see also* Relator Br. 31-33. These "disaggregation" allegations notably lack any

assertion that J&J provided factually false information regarding Levaquin's side effects to FDA, or that J&J's method of presenting the data violated any FDA standard or regulation governing NDA data sets. A-271-A-277 ¶¶ 58-67; *see also* 21 C.F.R. §§ 314.50(d)(5)-(6), (f).

Relator's "disaggregation" allegations fail for many reasons. For one, Relator's fraudulent-inducement theory requires him to allege that J&J made false statements that caused FDA to approve Levaquin. *See* Part II.A., *infra*. But Relator does not—and cannot—allege that J&J withheld aggregate data from FDA during the NDA process. To the contrary, Levaquin's approval package contains aggregated data, including for "psychiatric disorders." *See, e.g.*, A-360, A-365, A-370, A-380, A-389, A-397, A-409, A-420, A-434, A-449. Notably, the Second Amended Complaint relies on aggregated data on psychiatric disorders *taken from the NDA approval package*. *Compare* A-274 ¶ 61 (noting that study L91-059 had a 2.20% rate of psychiatric disorders), *with* A-389 (providing same data for study L91-059 showing same); *see also* A-360, A-365, A-370, A-380, A-397, A-409, A-420, A-434, A-449.

Rather than acknowledge this point, Relator instead focuses only on whether Levaquin's label, as amended in 2014, listed side effects in aggregate form. But Relator cannot plausibly allege that J&J made false statements to gain FDA approval of Levaquin *in 1996* based on allegations regarding how J&J listed possible side

effects on Levaquin's label *in 2014*. Relator's fraudulent-inducement theory cannot rest on pure speculation that, because additional safety information was discovered years after FDA approval, J&J must have known, and concealed, such information. That speculation falls short of satisfying either Rule 12(b)(6)'s plausibility standard or Rule 9(b)'s particularity requirement. *United States ex rel. Tessitore v. Infomedics*, 847 F. Supp. 2d 256, 265 (D. Mass. 2012) (finding argument "fallacious insofar as it presumes [defendant's] prior [misrepresentations] from … subsequent[ly]" discovered safety information).

Nor is there any merit to Relator's suggestion that disaggregated data is inherently misleading. By providing disaggregated data, J&J provided FDA with additional information about specific side effects—such as that insomnia occurred in more than 1% of patients, *e.g.*, A-410—that would not be apparent in a combined incidence rate. Indeed, a different relator could allege that an NDA applicant misled FDA by providing aggregated data on the theory that aggregation masks the incident rates for specific side effects. NDA applicants should not be subject to potential FCA liability when they list side effects separately and also when they list them in aggregate form.

Relator cites no case law to support this "aggregation" theory. Instead, he principally relies on *The Hobbit*. Relator Br. 29-30. The analogy is flawed, but

more fundamentally, a "children's classic" (*id.*) hardly provides a sound basis for interpreting the FCA.[11]

### C. Allowing Relator's Claim to Proceed Would Undermine FDA's Authority and Raise Serious Separation-of-Powers Concerns.

Relator's claim illustrates the significant problems an unbounded "fraudulent-inducement" theory would cause for the separation of powers. Were Relator's theory to prevail, Relator would be empowered to simultaneously exercise executive prosecutorial power and FDA regulatory authority, even in the absence of allegations that J&J violated any FDA regulation.

Article II demands that all executive power be vested in the President. *See* U.S. Const. Art. II § 1. Accordingly, executive power can be exercised only by the President and "Officers of the United States" acting at the President's direction. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203-04 (2020). Private relators, however, are not "Officers of the United States" under Article II. *See Cochise Consultancy*, 587 U.S. at 272. Although an FCA action is brought "for the person and for the United States Government" and "in the name of the Government," "it does not make the relator anything other than a private person, much less 'the

---

[11] Relator describes a scene in which Beorn meets a large group only in pairs and so does not know the total number seeking entry into his house. Relator Br. 30 & n.4. But there is no allegation that J&J told FDA about one (or two) side effects at a time. Relator instead complains about Levaquin's label having a list of all the relevant side effects. Relator Br. 32. That list could not mislead FDA about the number of potential side effects, because they all appear together.

official of the United States' referenced by the statute." *Id.* (quoting 31 U.S.C. § 3730).

Because the FCA's *qui tam* provisions vest executive power in the hands of private relators, a broad fraudulent-inducement theory would risk aggrandizing relators' limited prosecutorial power, in tension with Article II. *See, e.g.*, *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., concurring) ("[T]here are substantial arguments that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation."); *id.* at 451 (Thomas, J., dissenting) ("there is good reason to suspect that Article II does not permit private relators to represent the United States' interests in FCA suits"); *Cimino*, 3 F.4th at 426 (Rao, J., concurring). This tension counsels against expanding FCA liability beyond the statutory text.

Relator's fraudulent-inducement theory would also allow relators to exercise unprecedented regulatory authority. If a relator could pursue an FCA claim even in the absence of any allegation of a regulatory violation, the FCA would become a "back-door regulatory regime." *United States ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 620 (2d Cir 2016). Under that regime, FDA's expert, evidence-based decisions balancing the benefits and risks of different drugs could be abrogated by a relator's unfounded allegations questioning "precisely what representations were

essential to approval, which experts to believe, and how FDA interpreted submissions made to it." *D'Agostino v. EV3, Inc.*, 845 F.3d 1, 8-9 (1st Cir. 2016). And lay juries could find, based on their own weighing of a drug's benefits and effects, that FDA would not have approved the drug had the alleged misrepresentations not been made. *See id.* Such a veto of FDA's expert judgments would circumvent Congress's intent that FDA—not a financially motivated relator or lay jury—serve as the arbiter of the Nation's drug-approval process. *See* 21 U.S.C. § 355, *supra* pp. 5-7.

Relator's theory would also effectively nullify FCA's statute of limitations. The FCA requires that a claim be brought no more than ten years after "the date on which the violation is committed." 31 U.S.C. § 3731(b). Unlike government contracts, which generally operate on fixed periods, drug approvals from FDA are indefinite unless they are withdrawn by FDA. *See* 21 U.S.C. § 355(e) (providing process for withdrawing drug approval). Under Relator's theory, he can challenge FDA's decision to approve Levaquin nearly 30 years after that decision was made. Endorsing a fraudulent-inducement theory in an FDA-approval context could thus extend the FCA's statute of limitations far beyond the drug's initial approval, imposing the FCA's "essentially punitive" regime of treble damages and per-claim penalties with each reimbursement request. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000).

Vesting relators with such sweeping executive and regulatory authority would unsettle FDA's rigorous, research-backed approval process, upset industry, and frustrate patient care. Pharmaceutical companies, healthcare providers, patients, and other stakeholders rely on FDA's expert scientific judgments on drug approval, labeling, and post-approval marketing to prescribe existing drugs and develop new ones to improve the lives of patients. If hard-earned FDA approval could be forever second-guessed by relators and juries, it would deter pharmaceutical companies from investing in new drugs, undercut FDA's expert safety and effectiveness determinations, and ultimately deprive patients of viable treatments by forcing a product to be "withdrawn from the market even when the FDA itself sees no reason to do so." *D'Agostino*, 845 F.3d at 8 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)).

## II. Relator Also Failed to Plead Other Elements of His FCA Claim.

The district court dismissed Relator's claim based solely on the FCA's falsity element. A-21. Relator also failed to state a claim because he has not adequately alleged either causation or materiality.

To state a claim under a fraudulent-inducement theory, Relator needed to allege plausibly and with particularity that J&J fraudulently *induced* (*i.e.*, caused) FDA to approve Levaquin *and* that J&J's alleged false statements to FDA were material to CMS's decisions to pay the claims. Relator has done neither. He has not

sufficiently alleged that J&J's alleged false statements caused FDA to approve Levaquin, or that those statements were material to CMS's reimbursement decisions. The Court may affirm the dismissal of Relator's claim for failure to plead these essential elements of an FCA claim.

## A. Relator Failed to Plead Causation.

Relator must plead that J&J's alleged false statements "caused" the submission of false claims. *Petratos*, 855 F.3d at 487. Relator failed to allege that J&J's alleged false statements or omissions actually caused FDA to approve Levaquin. And the fact that FDA did not withdraw its approval of Levaquin after it learned of the alleged fraud precludes Relator from pleading this necessary element.

Courts applying the fraudulent-inducement theory have made clear that a relator must allege "that a defendant's fraud caused the government to enter a contract that later results in a request for payment." *Cimino*, 3 F.4th at 418; *see also United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa. 2014) ("[T]he essential element of inducement or reliance is one of causation."), *aff'd*, 593 Fed. App'x 139. The causation inquiry requires "actual causation under a but-for standard"—*i.e.*, that the contract would not have occurred "but for" the fraud. *Cimino*, 3 F.4th at 418. Put another way, the relator must allege that the government's "decision to award a contract was actually, not just potentially, based

on a false statement." *Thomas*, 991 F. Supp. 2d at 571; *see also Cimino*, 3 F.4th at 420.

Relator has not plausibly, or with particularity, alleged "but-for" causation. *See Cimino*, 3 F.4th at 421 (applying Rule 9(b)'s "heightened pleading standard"). To plead this requirement, Relator must allege that FDA would not have approved Levaquin but for J&J's false statements. *See D'Agostino*, 845 F.3d at 7. The Second Amended Complaint contains a conclusory allegation to this effect, A-291-A-292 ¶ 104, but conclusory allegations are insufficient to state a claim, *see Renfro v. Unisys Corp.*, 671 F.3d 314, 320 (3d Cir. 2011). Relator does not allege any facts supporting the implausible inference that FDA would not have approved Levaquin had it received additional information from J&J. Nor does Relator provide any support for the implausible inference that FDA approved Levaquin only because it received certain data in a disaggregated manner. That inference is particularly implausible here, given that FDA did receive aggregated data during the approval process. *See supra* p. 32.

Moreover, Relator cannot adequately allege causation because he does not—and cannot—allege that FDA withdrew approval of Levaquin after learning of the alleged false statements and omissions. *See D'Agostino*, 845 F.3d at 8 ("FDA's failure actually to withdraw its approval" after learning of the alleged fraud "precludes [a relator] from resting his claims on a contention that the FDA's

approval was fraudulently obtained").  Relator concedes that, when FDA learned of the alleged misrepresentations, it maintained its approval of Levaquin.  *See* A-288-A-289 ¶ 93.  That FDA responded to this information by making labeling changes—not by taking the drug (or its generic equivalents) off the market—precludes Relator from pleading causation.

B.     **Relator Failed to Plead Materiality.**

The district court dismissed Relator's First Amended Complaint for, among other things, failure to plead materiality—*i.e.*, that J&J's alleged misrepresentations or omissions were material to CMS's decision to pay for Levaquin.  *See* A-242-249. Although the court did not address materiality in dismissing the Second Amended Complaint, it too failed to plead materiality.

To plead materiality, a relator must allege facts showing that a claim's falsity "ha[d] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  This "materiality standard is demanding," and a case must be dismissed where a relator fails to plead materiality with the required plausibility and particularity.  *Escobar*, 579 U.S. at 194, 195 n.6.

Relator has not plausibly alleged that J&J's alleged misrepresentations were material.  In *Petratos*, this Court held that the relator did not plausibly plead materiality because "there are no factual allegations showing that CMS would not have reimbursed these claims" had the alleged misrepresentations not been made.

855 F.3d at 490. And, just like in *Petratos*, Relator "not only fails to plead that CMS 'consistently refuses to pay' claims like those alleged … but essentially concedes CMS would *consistently reimburse* these claims with full knowledge of the purported noncompliance." *Id.*

Relator admits that he disclosed information concerning J&J's alleged misrepresentations to FDA, *see* A-470, A-483, A-511, and to the Department of Justice, *see* A-212. But FDA denied in large part Relator's citizen petition, and at no point did the agency withdraw its approval for Levaquin. *See* A-472. FDA did not initiate other adverse proceedings against J&J, *see* A-101, and the Government declined to intervene in this suit. *See* A-212. Moreover, CMS continued reimbursing claims for Levaquin, s*ee* A-259; A-288, which is "very strong evidence" that J&J's alleged misstatements were "not material." *Escobar*, 579 U.S. at 195. Given the facts that FDA never revoked Levaquin's approval, never ordered generic levofloxacin to be withdrawn from the market, and continued reimbursing claims for Levaquin and generic equivalents, Relator cannot plausibly contend that J&J's alleged misrepresentations or omissions were actually material to the Government's payment decision. *See Petratos*, 855 F.3d at 490.

Relator's arguments to the contrary are unpersuasive. Relator asserts that the fact that FDA issued new safety announcements after receiving additional information "demonstrat[es] the materiality of the Defendants' misrepresentations."

Relator Br. 33. To the contrary, this fact demonstrates the *lack of* materiality. Materiality considers "whether the government's *payment* decision is affected" *Petratos*, 855 F.3d at 492 (emphasis added). As Relator admits, CMS continued paying for Levaquin claims even after it became aware of whatever facts Relator claims J&J omitted. "Simply put," any omission was "not material to the Government's payment decision" because "the Government would have paid the claims with full knowledge of the alleged noncompliance." *Id.* at 490 (cleaned up).

Relator also asserts that "FDA cannot retroactively ratify" false claims. Realtor Br. 25. But this issue is not about retroactive ratification. The point is that FDA's continued approval of Levaquin (and generic equivalents) and CMS's continued reimbursement for Levaquin demonstrate that the claims were never materially false in the first place. *See Escobar*, 579 U.S. at 195 (CMS's decision to pay claims after learning of an alleged falsity is "strong evidence" that the alleged falsity was not material); *Petratos*, 855 F.3d at 489-90 (same). Indeed, this Court considered and rejected a similar argument in *Petratos*, holding there that the materiality inquiry is correctly focused "on the Government's payment decision." 855 F.3d at 491.

Relator also fails to plead materiality with the particularity required by Rule 9(b). Relator has not pled with particularity *what* information would have been material to the Government's payment of claims, or *how* it would have been capable

of influencing those decisions.  Instead, Relator appears to rely on conclusory statements regarding materiality, *see* A-291-A-292, that are not only insufficient by themselves to state a claim but directly contradicted by the allegations in his complaint.

## III.  Alternatively, This Court Should Affirm Because the FCA's Public Disclosure Bar Warrants Dismissal.

Enacted partly to "stifl[e] parasitic lawsuits," *Graham Cnty. Soil*, 559 U.S. at 295, the public disclosure bar "disallows *qui tam* actions that rely on allegations that are, at least in substantial form, already known to the public." *Omnicare*, 903 F.3d at 81.  When the bar applies, the action may go forward only if the relator establishes that they are an "original source."  31 U.S.C. § 3730(e)(4)(B).

The public disclosure bar requires dismissal of J&J from this case.  Relator's complaint rests on allegations that J&J represented Levaquin as safe despite knowing about allegedly serious adverse side effects.  But this information appeared in numerous public disclosures, including in FDA-published research studies, public hearings, and Relator's citizen petitions to FDA.  Relator cannot escape the bar by claiming that he is an original source.  This Court can thus affirm on the alternative ground that Relator's complaint is foreclosed by the public disclosure bar.

**A.** **The Public Disclosure Bar Applies Because Relator's Allegations Are Substantially Similar to Numerous Public Disclosures.**

Relator does not dispute that he relied on publicly available information in drafting his complaint. Relator Br. 39 (noting "the information in the public domain"). Nor could he, given that the Second Amended Complaint extensively quotes publicly available documents. *E.g.* A-274 ¶ 61 (citing studies contained in Levaquin's approval package); A-286 ¶ 85 (relying on information presented at 2015 FDA Antimicrobial Drugs Advisory Committee hearing Relator attended).

Instead, Relator contends that his claims are not barred because "the publicly-disclosed information did not make out a claim that satisfied Fed. R. Civ. P. 9(b)." Relator Br. 39. But that is not the correct standard for determining whether the public disclosure bar applies.

1. The public disclosure bar requires a court to dismiss an action if "substantially the same allegations or transactions as alleged in the action … were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A). This Court has not interpreted this provision to require that every element of a complaint have been included in a prior public disclosure. Rather, it is enough that the public disclosures included the "essential elements" of the alleged fraud. *Omnicare*, 903 F.3d at 84.

To assess whether a prior disclosure included these "essential elements," this Court (like many others) "employs a formula of sorts." *Id.* at 83. Under that formula, a publicly disclosed transaction is substantially similar if it "raises an

inference of fraud" and "consists of both the allegedly misrepresented facts [X] and the allegedly true state of affairs [Y]." *Id.* at 83. To "disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." *Id.* at 84 (quotation marks omitted).

Contrary to Relator's suggestion, this formula for determining whether the public disclosure bar applies does not mirror Rule 9(b). If the Court had intended to apply Rule 9(b) in this context, the applicable test would be whether the public disclosures identified with particularity "the who, what, when, where and how of the events at issue." *Moore*, 812 F.3d at 307. But that heightened pleading standard is very different from the "X+Y=Z" formula that applies to the public disclosure bar. *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013). That test ensures that the public disclosure bar "has a generally broad scope," *id.* (cleaned up), because it does not even require an express allegation of fraud—only facts "that raise[] an inference of fraud." *Omnicare*, 903 F.3d at 83.[12]

---

[12] The district court suggested in dicta that public disclosures must satisfy Rule 9(b). *See* A-237 n.2. But neither this Court, nor any other court of appeals, has ever held that the public disclosure bar applies only when the prior disclosure would actually state a claim against the defendant. *See Moore*, 812 F.3d at 297 & n.2; *Holloway*, 960 F.3d at 847 n.5 (public "disclosure is not required to … provide a specific allegation of fraud, let alone a specific allegation of an FCA violation" (cleaned up)); *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1020 (9th Cir. 1999) ("[F]raud need not be explicitly alleged to constitute public disclosure.").

Nor would Relator's construction of the public disclosure bar make any practical sense. Under that theory, the public disclosure bar would require dismissal only of potentially meritorious suits, not ones that merely make copycat allegations that have already been determined to be insufficient to state a claim. And the notion that the bar applies only when the prior disclosure stated a claim is difficult to reconcile with Congress's judgment that various nonlitigation materials, such as press reports and administrative hearing documents, could constitute prior disclosure. *See* 31 U.S.C. § 3730(e)(4)(A).

2. Relator's complaint satisfies this Court's formula for applying the public disclosure bar. That is because each of the essential elements of the scheme Relator alleges was publicly disclosed.

**"X."** The allegedly misrepresented state of facts, or "X," was J&J's "represent[ation of] the safety of FQs to the FDA, patients, and the market at large." A-294 ¶ 108. Relator's principal allegation regarding how J&J misrepresented Levaquin is that it disaggregated adverse event data. A-271-A-272 ¶¶ 59-60. Indeed, Relator devotes an entire section of his brief to arguing that "the de-aggregation of data for material, adverse events constituted a fraudulent representation of drug safety." Relator Br. 29-33. But Relator's principal piece of evidence to support this fraud theory is the Levaquin label from May 2014. *See id*. at 32 (reproducing relevant portion of label). Because an FDA-approved label is a

public document, it is a relevant disclosure for purposes of applying the public disclosure bar. *See, e.g.*, *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 693 (8th Cir. 2014) ("FDA reports[] and federal regulatory disclosures" are public disclosures). Accordingly, the allegedly misrepresented state of facts, or "X," were publicly disclosed before Relator brought this suit against J&J in 2019.

**"Y."** The allegedly true state of facts, "Y," was also publicly disclosed before Relator brought this suit against J&J. Those factual allegations are that fluoroquinolones caused "adverse side effects," including adverse psychiatric side effects. A-294 ¶ 108. These adverse effects—along with J&J's alleged knowledge of these adverse effects—were publicly disclosed in FDA's own research reports, Relator's citizen petitions to FDA, and FDA's public responses and news releases.

Relator's Second Amended Complaint lists a 2013 study conducted by FDA's Dr. Deborah Boxwell as disclosing Levaquin's alleged "negative neurological and psychiatric effects." A-283-A-284 ¶ 75 (2013 FDA study); *see also* A-286 ¶ 85 (2015 presentation at FDA meeting disclosing the same side effects). The Second Amended Complaint notes that Relator's citizen petitions to FDA disclosed Levaquin's alleged adverse effects, including "mitochondrial toxicity" and "serious adverse psychiatric events." A-284 ¶¶ 77-78; *see also* A-116 (June 18, 2014 citizen petition); A-127 (September 8, 2014 citizen petition). And J&J's alleged knowledge of adverse side effects and inaction were also addressed in public disclosures. *See,*

*e.g.*, A-566 (asserting J&J knew about Levaquin's adverse effects because J&J employee had learned of them while working at FDA).

These disclosures trigger the public disclosure bar because FDA reports, citizen petitions (which are publicly available on FDA's website), and FDA public advisory committee hearings and associated material are all public disclosures for purposes of the bar. *See* 31 U.S.C. § 3730(e)(4)(A). Relator does not argue otherwise. Relator Br. 38-40 (challenging only whether the public disclosures are "substantially similar," not whether the disclosures were public.)

**"Z."** Taken together, the "X" and "Y" plainly "raise an inference of fraud." *Omnicare*, 903 F.3d at 83. The allegedly misrepresented state of facts—misrepresenting the safety of Levaquin by disaggregating the data on psychiatric side effects—was disclosed on Levaquin's FDA-approved label. And the allegedly true state of facts—that Levaquin caused adverse psychiatric side effects—was disclosed through FDA reports, citizen petitions, and public committee hearings. Relator's claims thus trigger the public disclosure bar.

## B. Relator Is Not an Original Source.

Relator attempts to avoid dismissal under the public disclosure bar by arguing that he "is an original source of a substantial part of the information that is at the foundation of his complaint." Relator Br. 41. That argument fails because Relator has not demonstrated that he materially added to the publicly available information.

Relator bears the burden of pleading facts establishing that he is an original source. *See United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 845 (3d Cir. 2014). Relator attempts to satisfy this burden in a single, conclusory sentence that cites no authority. Relator Br. 41. According to Relator, his status as an original source "is demonstrated by his SONAR Network research and his scientific work with mice … he obtained his research results firsthand; and they materially added to the information that was already in the public domain." *Id.* But neither the SONAR research nor Relator's mice work materially added to the publicly available information.[13]

"To 'materially add' to the publicly disclosed allegation or transaction of fraud, a relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality." *Moore*, 812 F.3d at 306 (cleaned up). "Specifically, a relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'" *Id.* at 307 (citation omitted).

---

[13] The FCA provides other ways for a relator to establish that he is an original source, 31 U.S.C. § 3730(e)(4), but Relator does not argue that they are applicable here. Relator has thus forfeited any additional arguments on this element. *See, e.g.*, *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 140 n.28 (3d Cir. 2024).

Relator's supposedly "independent" knowledge does not add to the public disclosures in any material way. Relator never explains how his "SONAR Network research" differs from the reports of adverse effects discussed extensively in the 2015 FDA meeting and in Dr. Boxwell's research for FDA in 2013. In fact, the Second Amended Complaint states that Dr. Boxwell's study disclosed "the *very same side effects* that Relator's patients had reported over the last five years and *the very same side effects* Relator's research had uncovered." A-284 ¶ 75 (emphasis added). Relator cannot be an original source of information when his own complaint identifies public disclosures with the same information.

The same goes for Relator's "work with mice." Relator Br. 41. This research did not even study Levaquin, and so Relator can hardly claim to have learned about Levaquin's side effects through this work. A-106. In any event, Relator alleges that, through his mice work, he learned of the alleged connection between mitochondrial toxicity and fluoroquinolones. Relator Br. 40. But, as the Second Amended Complaint concedes, Dr. Boxwell's 2013 research already identified this connection. *See* A-284 ¶ 75 ("Dr. Boxwell's findings linked Defendants' drugs to mitochondrial toxicity."). Relator does not explain how his mice research adds in any way—let alone any material way—to this public disclosure.

For these reasons, Relator has failed to establish that he is an original source, and the public disclosure bar warrants dismissal of the complaint.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.


August 8, 2024                          Respectfully submitted,

                                        /s/ *Mark W. Mosier*

S. Conrad Scott                         Mark W. Mosier
COVINGTON & BURLING LLP                 Krysten Rosen Moller
The New York Times Building             Kendall T. Burchard
620 Eighth Avenue                       Eli Nachmany
New York, NY 10018                      COVINGTON & BURLING LLP
(212) 841-1000                          One CityCenter
                                        850 Tenth Street NW
                                        Washington, DC 20001-4956
                                        (202) 662-6000


*Counsel for Defendants-Appellees Johnson & Johnson*

**CERTIFICATE OF COMPLIANCE**

1.      This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 11,686 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point, Times New Roman font.

3.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

4.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program, Advanced Endpoint Protection Cortex XDR Agent v. 8.1.0, has been run on the electronic file and no virus was detected.


August 8, 2024                                      */s/ Mark W. Mosier*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that the following attorneys whose names appear on the brief are members of the bar of this Court:

Mark W. Mosier

Krysten Rosen Moller

S. Conrad Scott

Kendall T. Burchard

Eli Nachmany

August 8, 2024                                  */s/ Mark W. Mosier*

**CERTIFICATE OF SERVICE**

I certify that on August 8, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Mark W. Mosier*